**UNITED STATES**

v.

**11,993.32 ACRES OF LAND, MORE OR LESS, IN MOUNTRAIL AND MC-KENZIE COUNTIES, N. D. et al.**

Civ. A. No. 2400.

United States District Court
D. North Dakota,
Northwestern Division.

Nov. 11, 1953.

See also 113 F.Supp. 590; 114 F. Supp. 756.

P. W. Lanier, U. S. Atty., Fargo, N. D., Max Caplan, Bureau of Land Management, Billings, Mont., and Dale Kent, Missouri River Division, Corps of Engineers, Omaha, Neb., for plaintiff.

Halvor L. Halvorson, Jr., of Minot, N. D., for defendant Earl Nice.

Roy A. Ilvedson and Kenneth G. Pringle, of Ilvedson, Pringle & Herigstad, Minot, N. D., for defendants George O'Malley and Francis K. Goodall.

Milton K. Higgins, John C. Gunness, of Cox, Cox, Pearce & Engebretson, Bismarck, N. D., John S. Miller, Tulsa, Okl., and Ella Van Berkom, Minot, N. D., amici curiae.

VOGEL, District Judge.

This is a condemnation proceedings by the United States to acquire lands for the reservoir to be created back of the Garrison Dam on the Missouri River in North Dakota. This action was commenced against certain described tracts, *plus accretions:* V–1926, owned by George O'Malley, containing 1103 acres, more or less; V–1934, owned by Earl L. Nice, containing 416.24 acres, more or less; and V–1966, owned by Francis K. Goodall, containing 308.67 acres, more or less. On October 14, 1952, plaintiff moved to dismiss the action as to a portion of the land in each of those tracts. On October 27, 1952, this motion was granted as of right. The result was that the legal descriptions remained the same, except the words "plus accretions" were omitted as to each tract, and the stated acreage was reduced to 829.99 acres in V–1926, to 122.12 acres in V–1934, and to 279.50 acres in V–1966.

Thus, the acreage in dispute here totals over 696 acres.

Thereafter, on September 29, September 30 and October 5, 1953, each of the defendants filed a supplemental answer claiming ownership of the accreted lands and severance damages therefor. As to the owners Nice and O'Malley, plaintiff filed replies denying that they owned the land as to which they claimed severance damages. On October 2, 1953, plaintiff moved for summary judgment that the lands be decreed to be the lands of the United States Government, as to which the United States has never divested itself of title.

Subsequently, on November 5, 1953, it was stipulated between the attorneys for the respective parties herein that the Motion for Summary Judgment filed by the United States on October 1, 1953, should be determined by the Court without further hearing or notice to any of the parties herein, and that such motion should be determined on the record exist-

ing in the files as of November 5, 1953, including all such matters as were stipulated at the pre-trial conference on September 30, 1953.

At such pre-trial conference, the parties stipulated into the record photostatic copies of the entry and patent in each case and the field notes and official plats of the survey for each tract involved, as well as a photostatic copy of the surveying instructions relating to meander lines issued by the Public Lands Department, dated June 30, 1894.

The entry (dated November 5, 1906) and patent (dated June 7, 1909) relating to the lands in V–1926 describe the "south half of the southeast quarter of Section twenty-one and the Lots one and two of Section twenty-eight in Township one hundred fifty-three north of Range ninety-three west of the Fifth Principal Meridian, North Dakota, containing one hundred forty-six and sixty-hundredths acres, according to the Official Plat of the Survey of the said lands, returned to the General Land Office by the Surveyor General." The application for entry contains an oath that the applicant has not acquired title to, nor is claiming under any of the agricultural public land laws, an amount of land which, together with the land applied for, would exceed in the aggregate 320 acres. The patent contains the following habendum: "To Have and to Hold the same, together with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging."

The entry (dated October 23, 1907) and patent (dated May 12, 1913) relating to the lands in V–1934 describe "Lots one, two and three of Section twenty-nine and the Lots three and four of Section twenty-eight in Township one hundred fifty-three north of Range ninety-three west of the Fifth Principal Meridian, North Dakota, containing one hundred fifty-three and ten-hundredths acres, according to the Official Plat of the Survey of the said Land." The habendum in the patent states, "with the appurtenances thereof."

The entry (dated November 26, 1909) and patent (dated April 6, 1915) relating to the lands in V–1966 describe "Lot two and the west half of the northeast quarter of Section thirty-four in Township one hundred fifty-three north of Range ninety-three west of the Fifth Principal Meridian, North Dakota, containing one hundred nineteen and fifty-hundredths acres, according to the Official Plat of the Survey of the said Land." The application for homestead entry carries an oath that the applicant has not entered and acquired title to, or claims under an entry made under any of the non-mineral public land laws, an amount of land which, together with the land applied for, exceeds in the aggregate 320 acres. The habendum in this patent likewise states, "with the appurtenances thereof."

It appears from the field notes and official plats of the survey, approved January 8, 1897, that the lots described in the patents were bounded, at the time of survey, on one side by the Missouri River which was surveyed by meander line. According to the *Manual of Surveying Instructions* (1894), page 56, rivers were to be meandered at the ordinary mean high water mark.

It is to be noted that none of the patents conveys the maximum amount of land which a homesteader might have acquired.

At the pre-trial conference, it was stipulated that W. R. Bandy is now Regional Chief of Engineering, Bureau of Land Management, and has been United States Deputy Surveyor for the General Land Office on Public Land Surveys (1906), Assistant Chief Engineer on irrigation projects in Idaho (1909–1910) and, since 1911, United States cadastral engineer for the General Land Office, now the Bureau of Land Management. It was agreed that he would testify that, as a result of his personal inspection of the lands on September 22, 23 and 24, 1952, and July 22, 1953, his opinion is that, with respect to Lot 2, Sec. 34, Twp. 153 N., R. 93 W. (V–1966), there existed at the date of homestead

entry of such lot, and at all times subsequent thereto, a strip of land formed by accretion about 1500 feet in width between the meander line as shown on the plat and the actual right bank of the Missouri River at the date of entry, and similarly a strip of accretions 600 feet wide as to Lots 1 and 2, Sec. 28 (V–1926) and a strip 700 feet wide as to Lots 3 and 4 of Sec. 28 and Lots 1 and 2 of Section 29 (V–1934).

It was stipulated that the defendants have been using the accretion lands in question and have improved the lands by clearing parts of them. The stipulation further provided that up until these particular actions no claim has been made for accretion lands in similar condemnation suits or negotiations with landowners. In so stipulating, the District Attorney stated that in explanation thereof the fact was "that this was not discovered to be true until subsequent to these happenings". The representatives of the Government also acknowledged that they knew of no specific instance where the Government had asserted any possessory rights by way of actual occupancy or improvements on the lands in question.

Shortly after the pre-trial conference, a letter, dated December 17, 1931, from D. K. Parrot, Acting Assistant Commissioner of the General Land Office, to George O'Malley, owner of lands in Tract V–1926 involved herein, was admitted into the record as Exhibit No. 13. The letter is as follows:

"Reference is made to your letter dated November 12, 1931, relative to areas formed along the Missouri River in T. 153 N., R. 93 W., 5th P. M., North Dakota.

"The plat of the above-mentioned township approved January 8, 1897, shows that the Missouri River was meandered and the river is represented as the boundary of the fractional lots abutting thereon.

"In making the public-land surveys, rivers are meandered for the purpose of ascertaining the quantities of land in the fractional sections, and not as boundary lines. The official plat prepared from the field notes represents the meander line as the border line of the river, and shows to a demonstration that the river bank, and not the meander line, is the boundary of the fractional lots (see Railroad Company v. Schurmeir, 7 Wall. 272 [19 L.Ed. 74]). The disposal of land by the United States that is bounded by a meandered stream, as shown by the plat of the original survey, therefore, under ordinary conditions, conveys to the patentee title to the actual bank of the stream, and after disposal the United States does not claim areas formed by accretion or by a sudden change in the course of the river in front of the patented lands. The laws of the State in which the lands are situated govern with respect to the extent of the riparian rights of the shore owners, and this office has no jurisdiction in the matter.

"The Supreme Court of the United States, in the case of Nebraska v. Iowa (143 U.S. 359 [12 S.Ct. 396, 36 L.Ed. 186]), held that when grants of land border on running water and the banks are changed by the gradual process known as accretion, the riparian owners boundary line still remains the stream, but when the boundary stream suddenly abandons its old bed and seeks a new course by the process known as avulsion, the boundary remains as it was in the center of the old channel."

There is nothing in the record, other than the physical fact itself as determined by Mr. Bandy, to show that the patentees were aware of the extent of the accretions at the time they entered upon the land.

The motion of the United States for summary judgment that this Court declare that the accretions added to the three tracts are lands of the United States as to which the United States has never divested itself of title brings before the Court the issue herein. Brief-

ly stated, the question is: Do lands formed by accretion between the date of survey and the date of entry or patent pass with the patent where the lot or land conveyed by the patent was surveyed and platted by meander lines which followed the sinuosities of the Missouri River and was conveyed "according to the Official Plat of the Survey of said lands returned to the General Land Office by the Surveyor General"?

Other condemnation actions pending in this court and proposed actions for the condemnation and acquisition of lands by the Government on the Missouri River above the Garrison Dam involve similar accretion lands used and improved by the original patentees which have been bought and sold and leased by such patentees and their successors in title. The answer to the question has, then, far-reaching effects. A number of attorneys representing oil companies who had acquired leases upon accretion lands and attorneys representing purchasers of land from the original patentees or their assigns asked permission of the Court to appear at the time of the pre-trial conference and to file briefs as *amici curiae*. Such briefs, as well as the briefs of the parties, have been given consideration herein.

The general rule conceded by all parties regarding the ownership of accretion is found in Jefferis v. East Omaha Land Co., 134 U.S. 178, 189, 10 S.Ct. 518, 520, 33 L.Ed. 872:

"It is distinctly alleged in the bill that the new land is an accretion to that originally purchased by the patentee from the United States. The rule of law applicable to such a state of facts is thus stated by this court in [Mayor, Aldermen And Inhabitants of] New Orleans v. United States, 10 Pet. 662, 717, [9 L.Ed. 573]: 'The question is well settled at common law, that the person whose land is bounded by a stream of water which changes its course gradually, by alluvial formations, shall still hold by the same boundary, including the accumulated soil.

No other rule can be applied, on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory; and, as he is without remedy for his loss in this way, he cannot be held accountable for his gain.' And in Banks v. Ogden, 2 Wall. 57, 67 [17 L.Ed. 818], it is said: 'The rule governing additions made to land bounded by a river, lake, or sea, has been much discussed and variously settled by usage and by positive law. Almost all jurists and legislators, however, both ancient and modern, have agreed that the owner of the land thus bounded is entitled to these additions. By some, the rule has been vindicated on the principle of natural justice, that he who sustains the burden of losses and of repairs, imposed by the contiguity of waters, ought to receive whatever benefits they may bring by accretion; by others, it is derived from the principle of public policy, that it is the interest of the community that all land should have an owner, and most convenient that insensible additions to the shore should follow the title to the shore itself.'"

It is the contention of the Government that the well-established rule that the boundary of such a grant as we are dealing with here is the actual waterline and not the meander line has two exceptions:

■ First, that the *meander line* will be treated as the true boundary where, by reason of fraud or mistake ·in the survey, there was in fact *at the time of the survey* a substantial amount of land between the survey line and the actual shore. This exception, that is, where fraud or mistake in the survey can be shown, is well founded in the authorities and is not refuted by the defendants. Jeems Bayou Fishing & Hunting Club v. United States, 1923, 260 U.S. 561, 43 S.Ct. 205, 67 L.Ed. 402, and cases cited therein.

The second exception which the Government claims to exist, and upon which it relies herein, is that the meander line will be treated as the boundary of the grant if, between the time of the survey and the time of entry, a *substantial amount* of land was formed by accretion between the survey line and the waters of the stream.

No United States Supreme Court case justifies the existence of such second exception, but two comparatively recent lower court decisions have stated such a rule: United States v. Eldredge, D.C. Mont.1940, 33 F.Supp. 337; and Wittmayer v. United States, 9 Cir., 1941, 118 F.2d 808. On its facts, it is doubtful if United States v. Eldredge, supra, is authority for such proposition inasmuch as the Court therein states, in giving its conclusion, that, " * * * the lands here in question were in place at the time the survey was made * * *." 33 F.Supp. at page 341. This would indicate that the Court therein based its conclusion upon the so-called first exception relating to mistake or fraud in the survey—the rule which the Court states specifically that plaintiffs cited to it. 33 F.Supp. at page 340. As authority for its statement of the rule (the second exception), United States v. Eldredge cites Lammers v. Nissen, 154 U.S. 650, 14 S.Ct. 1189, 25 L.Ed. 562; Gleason v. White, 199 U.S. 54, 25 S.Ct. 782, 50 L.Ed. 87; and Horne v. Smith, 159 U.S. 40, 15 S.Ct. 988, 40 L.Ed. 68.

Lammers v. Nissen is an appendix decision made in 1879, before the decision in Jefferis v. East Omaha Land Co., 1890, supra, and not reported until 1893. "The only question in this case is whether as a matter of fact, when * * * purchased from the United States, * * * there was in front and outside of the meandered line of the lot any land that could be cultivated, * * *." "There is no dispute between the parties as to the law." The decision affirms a decision of the Nebraska Supreme Court—a state which does not follow the general rule as to accretions but holds that the meander line is pre-

sumptively the boundary. Patton on Titles, page 247.

Horne v. Smith, 1895, is quite plainly based on mistake in survey. "It was not land formed by accretion since the survey." 159 U.S. at page 42, 15 S.Ct. at page 989. "There has been simply an omission to make any survey of the tract west of the bayou, and between it and the main body of the Indian river." 159 U.S. at page 44, 15 S.Ct. at page 990.

Gleason v. White was based on mistake in giving conflicting patents—the first under a survey, which conflicted with a later survey then in existence. The first patentee had knowledge of the later survey when he obtained his patent; in fact, he had requested it. This was not treated as a question of accretions subsequent to survey.

Wittmayer v. U. S. appears to be the first case that flatly states the rule contended for by the Government to be a second exception to the general rule. Two things must be considered in evaluating the view that the Court took of the law in that case. First, it presented a peculiar fact situation, materially different from that in the instant case. The land had apparently been surveyed as an island—entirely meandered—with a new course of the river on the east and the lately-abandoned river bed on the west. The old river bed on the west was subsequently built up by flood-water deposits. It is with this area that the Court appears to have been most concerned. Secondly, the case was disposed of on procedural grounds—the Court of Appeals refused to overturn the lower Court's findings of fact.

As authority for its proposition of law stated as the second exception to the general rule, the Wittmayer case cites Granger v. Swart, 10 Fed.Cas. page 961, No. 5,685; Mecca Land & Exploration Co. v. Schlecht, D.C.Ariz.1925, 4 F.2d 256; and U. S. v. Eldredge, supra.

In the Mecca Land case, while the Court, in its decision, makes statements suggestive of the rule of the second ex-

ception under consideration, the decision appears to turn largely on a notion of estoppel inasmuch as the patentee and his grantee made no claim to the accreted land for more than fifteen years after entry while the Government had made vast improvements thereon.

"A short time after their entries, they saw the government in possession of this *unsurveyed land,* making vast improvements in its endeavor to protect the land and reclaim it for settlement. When the patents were issued, they applied to purchase, and did purchase, receive, and pay for, a definite number of acres as contained in the fractional lots shown on the plat. They never occupied this land, and never at any time asserted any right of possession or claim of title. *Both the government and the entrymen recognized the meander line as described in the plat and patents, and not the river, as the boundary. They never intended to purchase, and the government never intended to convey, more land than was described in the patents, and especially land that was not surveyed.*

"Under this state of facts, I am forced to conclude that the general rule does not apply in this case, and that the meander line, and not the river, constitutes the boundary of the plaintiff's lands." [4 F.2d 260.] (Emphasis supplied.)

The Granger v. Swart case, 10 Fed. Cas. page 961, No. 5,685, has been cited as authority for the second exception in both the Wittmayer and Eldredge cases. The Granger v. Swart decision was cited to the Supreme Court of the United States in Jefferis v. East Omaha Land Co., supra. The Court therein failed to make specific reference to the exception stated in Granger v. Swart, but in arriving at its conclusion stated, 134 U.S. at page 194, 10 S.Ct. at page 522:

"It is a familiar rule of law that, where a plat is referred to in a deed as containing a description of land, the courses, distances, and other particulars appearing upon the plat are to be as much regarded, in ascertaining the true description of the land and the intent of the parties, as if they had been expressly enumerated in the deed. Fox v. Union Sugar Refinery, 109 Mass. 292. This rule is applicable to government lands bounded by the Missouri River, as the same are surveyed and platted under the acts of congress; and *the patent passed the title of the United States to lot 4, not only as it was at the time of the survey in 1851, but as it was at the date of the patent in 1855, so that the United States did not retain any interest in any accretion formed between the survey in 1851 and the date of the patent."* (Emphasis supplied.)

Such language is a direct repudiation of the statement of law contained in Granger v. Swart. In addition thereto, Granger v. Swart involved conflicting patents "but it does not appear whether they were based on the same or different surveys". Mecca Land & Exploration Co. v. Schlecht, D.C., 4 F.2d 256, 260.

■ Madison v. Basart, (1947) 59 L. D. 415, is an administrative ruling by Chapman, Under Secretary of the Interior, which expressly applies the so-called second exception, overruling prior administrative decisions in conflict therewith. (See note 15 to that opinion.) As authority for the exception, the opinion cites the Wittmayer, Eldredge, Mecca and Granger v. Swart cases, discussed above. It also cites First National Bank of Decatur, Neb. v. U. S., 8 Cir., 1932, 59 F.2d 367; R. M. Stricker, (1924) 50 L.D. 357; Instructions of April 17, 1918, 46 L.D. 461, 463–465; Bissell v. Fletcher, 1886, 19 Neb. 725, 28 N.W. 303, Id., 27 Neb. 582, 43 N.W. 350.

Such administrative rulings cited are not necessarily authoritative here. The Nebraska case should not be considered as authority for the exception, since Nebraska does not follow the general rule.

The First National Bank of Decatur case does not support the proposition

678

contended for by the Government, since the land there involved was not surveyed nor patented as a lot with a meander line, but, rather, as a delineated fraction of a section. Between the time of the survey and the time of the entry, the river had cut back not only through surveyed lands between defendant's tract and the river but into the defendant's tract as well and then had again receded. Defendant claimed title

> " * * * on the ground that, when the river moved westward and encroached upon the land which defendant now owns, these lands *thereby became riparian,* and that when the river again receded, leaving a considerable area of land between section 33 and the west river bank, these intervening lands became attached to its lands as accretions thereto, on the theory that land 'once riparian, always riparian.' " (Emphasis Supplied.) 59 F. 2d at page 369.

In rejecting such contention, the Court said, 59 F.2d at page 370:

> "In the instant case, the survey, the plat, the selection and allotment entry, the patent, and the mesne conveyances from the patentee to the defendant, all disclose that no more property was conveyed than that contained within the subdivision lines of the property described. These various records and documents reflect the intention of the parties, and where that is manifest it is controlling. The government survey creates and does not merely identify sections, subdivisions, and boundaries, and this survey, the government plat, and the government patent are not open to challenge by collateral attack. Russell v. Maxwell Land Grant Co., 158 U.S. 253, 15 S.Ct. 827, 39 L.Ed 971; Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566.
>
> "We reiterate that the lands to which the defendant asserts title in this suit are not now and were not at any time since their original selection by the allottee riparian in character, and the defendant is bound by the descriptions contained in the patents, which cannot be challenged in this suit. The judgment appealed from is affirmed."

The reasoning of that case, however, suggests an idea applicable here. It said that the character of the land, whether riparian or not, prior to the entry was a closed book, and it made that statement in a case where the land was not surveyed as riparian. That idea, applied here by analogy, would mean that physical changes between the survey and patent are not to be looked at in determining whether land is riparian or not. Since it was surveyed and patented as riparian, it is riparian, absent mistake or fraud in the survey or in the patenting.

Madison v. Basart, (pages 8, 9) advances the following reasons for the second exception:

1. The patentee does not receive acreage substantially in excess of the amount which he has claimed and paid for.

2. No entry can be made on unsurveyed lands.

3. It avoids difficulties that might be encountered where the total of the platted land, plus accretions thereto, which is claimed, exceeds the total permitted by the homestead laws.

4. A patentee who stands to gain by large accretions between the survey and patent does not run the risk of loss of a riparian owner.

■ The last argument is specious. A large accretion itself demonstrates the risk of an equally large erosion. A rule of law cannot control the vagaries of a river. Hence, the general rule rests upon the equitable idea that a riparian owner should have the opportunity to gain by accretion since he is subject to the hazard of loss by erosion.

■ The third argument has no basis where, as here, the entry and patent

are not for the full amount permitted by the homestead laws. '

■ The second argument must be weighed against the fact that the general area within which the tract lies had been surveyed.

■ The first argument is doubtful in the light of the reason for the general rule. The excess is offset in value by the hazard assumed. Furthermore, it is generally said that meander lines are for the purpose of ascertaining the quantity of land to be charged for. Railroad Co. v. Schurmeir, 7 Wall. 272, 19 L.Ed. 74. Exactness in the survey of rivers was, as a practical matter, impossible; stability of such a survey could not have been contemplated. Therefore, approximation must have been the resolution intended.

■ The rule of the second exception as contended for here by the Government suggests its own unfitness. Certainty of titles is a fundamental consideration in the broad area of law concerned with conveyancing. A rule based upon a determination of whether the accretion between the time of survey and the time of entry is substantial or not necessarily makes the scope of a patent of land bounded by a meander line uncertain or makes the meander line presumptively the boundary line, which it confessedly is not. Such a rule as suggested by the Government would be that generally the patentee acquires the accretions but that if he stands to get too much according to an uncertain standard, he then doesn't get any. Such an exception would soon displace the generally accepted rule that a patentee, on lands bounded by water, owns the accretions thereto in the absence of fraud or mistake.

The Government also cites, in support of its contention, Producers Oil Co. v. Hanzen, 238 U.S. 325, 35 S.Ct. 755, 59 L.Ed. 1330. That case is authority for

" * * * the principle that facts and circumstances may be examined, and if they *affirmatively disclose an*

*intention to limit the grant to actual traverse lines, these must be treated as definite boundaries*. It does not necessarily follow from the presence of meanders that a fractional section borders a body of water, and that a patent thereto confers riparian rights." 238 U.S. at page 339, 35 S.Ct. at page 760. (Emphasis supplied.)

■ In the instant case, the record discloses that at the time of the survey the meander lines were adjacent to the boundary of the Missouri River; that the lands described by the Government survey and the patent issued thereon were riparian lands and that the intention of the parties was to convey lands bordering on the Missouri River not limited by meander lines. This is evidenced not only by the survey, the official Government plat and the patents based thereon, but by the use and improvements on the lands themselves by the patentees and their successors in interest as well as by Plaintiff's Exhibit 13, being the letter from the Acting Assistant Commissioner of the General Land Office, dated December 17, 1931.

If the intention of the parties means anything in the solution of this problem, and the Courts have said that where such intention is manifest it is controlling (First National Bank of Decatur, Neb. v. U. S., supra; Producers Oil Co. v. Hanzen, supra), then if there was an intention here to limit the conveyances by the exclusion of accretions, such intention could easily have been evidenced by including the words "without accretions" in the patents. Instead of so doing, and after having been warned by the Supreme Court in the rule laid down in Jefferis v. East Omaha Land Co., supra, the patents conveyed land "according to the Official Plat of the Survey of said lands returned to the General Land Office by the Surveyor General".

■ All of the cases cited in support of the alleged second exception by the Government can be distinguished on

their facts from the situation with which we here deal. It must be conceded that there existed here no fraud or mistake with reference to the running of the survey; that at the time of the survey the lands subsequently patented bordered upon the Missouri River; and that between the time of the survey and the time of the entry accretions had been formed by the river. If the patents herein had been issued simultaneously with the survey or immediately following the survey, no one could deny that the boundary of the patentees' land was the Missouri River. In other words, these were riparian lands at the time of survey. That they can be so characterized is clear from the survey, as they are bounded by the Missouri River—the meander line merely marking in a general way the sinuosity of the river bank and with no intent to indicate anything else. There is no room here for doubt as to the meaning of the survey. It intended the river bank as the boundary and there existed no unsurveyed lands between the meander line and the river bank. The survey shows lands bordering on the Missouri River and nothing indicating an intent that the survey stopped short of the river itself. The Government survey characterized the lands as riparian. What happened prior or subsequent is of no moment here. The patent conveyance "according to the official plat" carried with it the rights to accretion as well as the hazard of loss thereby. The vagaries of the Missouri River, which built up the accretions between the time of survey and the time of entry, took such accretions from some other landowner. It might as easily have taken these away, and more. These accretions, according to the familiar and well established rule, were transferred to the patentees and the Government retained no interest in such accretions and does not have title thereto at the present time.

The motion for summary judgment made in behalf of the Government will be denied.

It will be so ordered.