**Robin Ann BEAR, et al., Plaintiffs,**

v.

**The UNITED STATES of America, et al., Defendants.**

**The WINNEBAGO TRIBE OF NEBRASKA, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Robin Ann BEAR, et al., Plaintiffs,**

v.

**The UNITED STATES of America, et al., Defendants.**

**The WINNEBAGO TRIBE OF NEBRASKA, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Nos. CV 82–0–199, CV 82–0–200, C 82–4052 and C 82–4053.**

United States District Court, D. Nebraska.

June 6, 1985.

---

Charles L. Smith, Telpner & Smith, Council Bluffs, Iowa, Patrick Kennison, Kutak, Rock & Huie, Omaha, Neb., Dale White, Fredericks & Pelcyger, Boulder, Colo., for plaintiffs.

Paul W. Madgett, Asst. U.S. Atty., Douglas P. Misterek, U.S. Army Corps of Engineers, Aaron Hostyk, Office of Counsel Corps of Engineers, Omaha, Neb., Evan L. Hultman, U.S. Atty., Asher E. Schroeder, Asst. U.S. Atty., Cedar Rapids, Iowa, John P. Sarcone, Asst. Atty. Gen., Des Moines, Iowa, George F. Madsen, F. Joseph Du-

Bray, Paul D. Lundberg, Sioux City, Iowa, for defendants.

## MEMORANDUM AND ORDER

BEAM, District Judge.

These matters are before the Court upon the defendants' joint motion to reconsider the Court's denial of their motions for summary judgment (filing 38 in CV 82-0-200; filing 49 in C 82-4053; filing 61 in C 82-4052; and filing 62 in CV 82-0-199). A hearing was held on the motion on November 8, 1984. The Court, being fully advised in the premises, now finds that the motion should be sustained, in part.

Summary judgment should be granted "only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir.1980). Even under this standard, the Court finds that in the instant cases a substantial number of claims may be resolved through summary judgment.

The Winnebago Tribe of Nebraska and various individuals are the plaintiffs in four cases which have been consolidated in this Court. In CV 82-0-200 (D.Neb.) and C 82-4053 (D.Iowa) the Tribe contends that a 1972 stipulation which purported to waive its rights to contest condemnation actions against lands on the eastern bank of the Missouri River is void. In CV 82-0-199 (D.Neb.) and C 82-4052 (D.Iowa) the heirs of the original allottees of certain parcels[1] are suing the United States and private corporations to quiet title to tracts of accretion land[2] on the Nebraska/Iowa border.

The defendants are the United States, the Army Corps of Engineers, the State of Iowa, Briar Cliff College, and the Sinsinawa Dominican Congregation of the Most Holy Rosary of Sinsinawa, Wisconsin. They contend, among other things, that the plaintiffs' claims are barred by the doctrines of res judicata, collateral estoppel, statutes of limitation and laches.

The facts surrounding the claims of the allottees will be presented first. In 1872, forty-acre parcels in Thurston County, Nebraska, were patented to David Horn, Reu-

---

1. In CV 82-0-199 (D.Neb.), the allottees are suing to quiet title to two parcels of land identified in the plaintiffs' fifth amended complaint as containing 613.78 and 62.02 acres. These parcels are located west of the 1943 compact line entirely within the State of Nebraska.

   In the Iowa case, C 82-4052 (D.Iowa), the allottees are suing to quiet title to two parcels that lie east of the 1943 compact line. This property is identified in the plaintiffs' sixth amended complaint as containing 333.39 and 5.26 acres.

2. The Court recognizes the technical distinction between the term "accretions" and the term "relictions." Accretions or accreted lands are additions to the area of realty from gradual deposit by water of solid material, whether mud, sand, or sediment, producing dry land which before was covered by water, along banks of navigable or non-navigable bodies of water. *United States v. Wilson,* 433 F.Supp. 57, 62–63 (D.Iowa 1977) ("accretion" and "reliction" defined); *Board of Public Works v. Larmar Corp.,* 262 Md. 24, 277 A.2d 427 (1971) (same); *Smith v. Whitney,* 105 Mont. 523, 74 P.2d 450, 453 (1937). Reliction is the term that is applied to land that has been covered by water, but which has been uncovered by the imperceptible recession of the water. *Wilson,* 433 F.Supp. at 62–63; *Larmar Corp.,* 262 Md. at 434, 277 A.2d at 40; *Martin v. Busch,* 93 Fla. 535, 112 So. 274, 287 (1927).

   Technically speaking, land uncovered by a gradual subsidence of water is not an accretion but a reliction, but the terms are often used interchangeably, *Omaha Indian Tribe v. Wilson,* 614 F.2d 1153, 1157–58 (8th Cir.1980), and law relating to accretions applies in all its features to relictions. *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 379–80, 97 S.Ct. 582, 591–92, 50 L.Ed.2d 550 (1977); *Omaha Indian Tribe v. Wilson,* 614 F.2d 1153, 1157–58 (8th Cir.1980); *Hanson v. Thornton,* 91 Or. 585, 179 P. 494 (1919); *see generally,* 3 American Law of Property § 1526 at 855 (A.J. Casner ed. 1952). The Court will use the term "accretion" to designate both the residue that forms accretion lands and reliction lands resulting from the gradual retreat of a body of water.

ben Decora[3] and one Mrs. Jackson.[4] At such time only the Jackson parcel was riparian. At some point in time between 1872 and 1906 the Missouri River changed course towards the west and all three parcels became riparian. Then, at some time prior to 1926 the River receded,[5] adding accretions to the lots.

In 1927, 1928 and 1929 the heirs of Horn, Decora and Jackson conveyed their land by warranty deed to Thomas Ashford. The Horn deed expressly provided that both accretions and the original allotment were to be conveyed. Accretion lands were not mentioned in the other two deeds.

The individual allottees contend that title to the land which accreted to the Decora and Jackson parcels[6] did not pass to Ashford because conveyance of accretion land was not explicitly provided for in the warranty deeds.

■ When accretion lands are added by natural forces, the owner of the original body of land acquires title to the new land that is formed. *Jefferis v. East Omaha Land Co.,* 134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872 (1890); *United States v. Wilson,* 523 F.Supp. 874 (N.D.Iowa 1981) (lands added by accretion become the property of the riparian owner); *Wiltse v. Bolton,* 132 Neb. 354, 272 N.W. 197 (1937); *Mercurio v. Duncan,* 131 Neb. 767, 269 N.W. 901 (1936); *see generally* 3 American Law of Property § 1527 (A.J. Casner ed. 1952). According to the "doctrine of title by accretion," when the land conveyed is bounded by water, it is to be regarded as the expectancy of both grantor and grantee that it should continue to be so bounded. *See, e.g., Jefferis,* 134 U.S. at 189, 10 S.Ct. at 520; *Meyers v. Mathies,* 7 So. 605 (La.

1890); *LeBeau v. Gavin,* 37 Mo. 556 (1866). "It is well settled law that a conveyance of lands bordered by a river and intended to be riparian ... carries with it all accreted lands." *Choctaw and Chickasaw Nations v. Cox,* 251 F.2d 733, 735 (10th Cir.1958). Therefore, title to accretion lands unless preserved passes with any conveyance of the land to which it is appurtenant. *Illinois Central R.R. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892); *United States v. 11,993.32 Acres of Land,* 116 F.Supp. 671, 678 (D.N.D.1953) ("if there is an intention here to limit the conveyance by the exclusion of accretions, such intentions could easily have been evidenced by including the words 'without accretions' in the patents"); *Jackson v. Montana,* 181 Mont. 257, 593 P.2d 432, 436 (1979) (where grantors' conveyance did not except or reserve the accretions, the accretions were conveyed to the grantees); *Sioux City v. Chicago & Northwestern Railroad,* 129 Iowa 694, 106 N.W. 183 (1906); *DeLong v. Olsen,* 63 Neb. 327, 88 N.W. 512 (1901). This rule applies to lands included within Indian reservations. *Choctaw and Chickasaw Nations v. Seay,* 235 F.2d 30 (10th Cir. 1956).

■ The plaintiffs make much of the fact that accretions were expressly provided for in the deed conveying the Horn allotment. The Court refuses to find that the state of mind of Horn's heirs in some way affected the state of mind of the grantors of the Decora and Jackson parcels. One could as easily conclude that the grantors of the Decora and Jackson lot intended to convey the accretions as Horn did, but being aware of applicable law, chose to do so by remaining silent on the

---

**3.** The Reuben Decora allotment is located in the Southeast Quarter of Section 35, Township 27 North, Range 9 in Thurston County, Nebraska. The original patent for this allotment was issued on October 22, 1872.

**4.** The allotment issued to Mrs. Jackson was Lot 7 of the Southeast Quarter of Section 35, Township 27, Range 9 in Thurston County, Nebraska. The original patent for this allotment was issued on October 22, 1872.

**5.** *See* Findings of Fact and Conclusions of Law Nos. 13 and 14 in *United States v. Wilcox,* No. 1314, slip op. at 4 (D.Neb.1938).

**6.** This claim covers all of the accreted land that extends in an easterly direction from the original allotment which has a legal description of Lot 8, in the Southeast Quarter of Section 35, Township 27, Range 9 in Thurston County, Nebraska.

matter. In all likelihood, grantors' attorney in the Horn grant was a more thorough practitioner.

The court, having reviewed all the evidence provided by the plaintiffs in the light most favorable to them, is compelled to apply here the well-established principle that accretions ordinarily pass upon a conveyance of a parcel of real estate absent a specific reservation of title. Accordingly, the allottees' claims with respect to accretion lands will be denied. Summary judgment will be granted accordingly.

Facts predicate to deciding the Tribe's claims follow.[7] In 1970 the United States initiated condemnation actions against Winnebago treaty lands[8] (tracts 119 and 210) along the eastern bank of the Missouri River. *See United States v. 1,716.18 Acres of Land,* No. 70–C–3014–W, slip op. at 11 (N.D.Iowa 1971). The treaty lands were being appropriated for a recreational facility.

The Tribe answered and filed a cross petition challenging the United States' authority to condemn the land in question. Shortly thereafter the Tribe agreed to relinquish title to the subject property. A stipulation was signed by the attorney for the Tribe[9] and the State of Iowa, but was not signed by an official of the United States government. The land was later condemned by the United States.

The Native American plaintiffs contend that the lack of federal approval renders the June 13, 1973, stipulation void under the Indian Non-Intercourse Act, 25 U.S.C. § 177. That statute provides:

No purchase, grant, lease or other conveyance of lands, or of any title or claim

thereto of any Indian nation or Tribe of Indians shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177.[10] *See also Oneida Indian Nation v. County of Onedia,* 414 U.S. 661, 668–69, 94 S.Ct. 772, 777–78, 39 L.Ed.2d 73 (1974) (Indian title can be extinguished only with consent of the federal government); *United States v. Santa Fe Pac. R.R. Co.,* 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941) (same, citing cases). The Tribe contends that the above-mentioned stipulation is void because it was not approved by Congress or the Secretary of the Interior.

The defendants in this action do not contend that a government official signed or constructively approved of the stipulation in question. The defendants argue that (1) under *Federal Power Com'n. v. Tuscarora Indian Nation,* 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), the United States need not obtain congressional approval to condemn the land in question; and (2) in the event that this Court rejects their first argument, counsel for the Tribe, as constructive agent for the Bureau of Indian Affairs (BIA), was authorized to approve the stipulation. These issues must be considered in light of the distinctive principles which govern federal government relations with the Indians.

■■■ The United States holds most Indian land in trust for Indians and their tribes. *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 574, 5 L.Ed. 681 (1823) (establishing the principle that tribes do not hold, and thus cannot convey, fee interests in the

---

**7.** It appears that the Tribe may also be presenting claims involving the conveyance of accretion lands. If in fact such claims still linger, the Court's finding on this issue as set forth above will control.

**8.** These lands were held under an 1865 treaty with the Winnebago Indians, in which the United States agreed "to set apart for the occupation and future home of the Winnebago Indians,

forever," the tribal lands at issue. Proclamation of March 28, 1866, 14 Stat. 671.

**9.** Mr. Fritz Cassman, an Omaha, Nebraska, attorney, was hired by the Bureau of Indian Affairs to represent the Winnebago Nation in the condemnation proceedings.

**10.** Similarly, 25 C.F.R. § 152.22 provides that "[t]rust or restricted lands ... may not be con-

lands they occupy[11]); *Jackson v. Porter,* Fed.Cas. No. 7, 143 (C.C.D.N.Y.1825) (the seisin of lands of Indian tribes is in the sovereign). In *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), Chief Justice Marshal observed that an Indian tribe, in its relationship to the United States, "resembles that of a ward to his guardian." *Id.* at 17; *see also* F. Cohen, *Handbook of Federal Indian Law* 220–221 (1982 ed.) (hereinafter *Cohen* ) (trust relationship is "one of the primary cornerstones of Indian law").

■■■■■ Special rules of construction arising out of this trust relationship govern the interpretation of statutes that regulate Indian conduct. *Id.* (Courts presume that Congress' intent towards Indians is benevolent); *see also* Wilkinson & Volkman, *Judicial Review of Indian Treaty Abrogation,* 63 Calif.L.Rev. 601, 620–23 (1975) (special cannons of construction designed to rectify inequality in bargaining power). Statutes and treaties are to be liberally construed to favor Indians, *see, e.g., Choctaw Indian Nation v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 677–78, 87 L.Ed. 877 (1943); *Tulee v. Washington,* 315 U.S. 681, 684–85, 62 S.Ct. 862, 864–65, 86 L.Ed. 1115 (1942); *Choate v. Trapp,* 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912), and all ambiguities are to be resolved in their favor. *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973); *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930); *Winters v. United States,* 207 U.S. 564, 576–77, 28 S.Ct. 207, 211–12, 52 L.Ed. 340 (1908).

In *Tuscarora Indian Nation,* 362 U.S. at 99, 80 S.Ct. at 543, the Supreme Court observed that "the obvious purpose of [25 U.S.C. § 177] is to prevent unfair, improvident or improper dispositions of land owned or possessed by Indians to other parties...." *Id.* at 119, 80 S.Ct. at 555; *Schaghticoke Tribe of Indians v. Kent School Corp.,* 423 F.Supp. 780, 784 (1976); *but see Mashpee Tribe v. Watt,* 542 F.Supp. 797, 803 (D.Mass.1982), *aff'd,* 707 F.2d 23 (1st Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 555, 78 L.Ed.2d 728 (1983) (purpose of section 177 was to prevent Indian uprisings and preserve peace along the frontier). Because of the United States' special status as trustee for the Indians, the *Tuscarora* Court held that the Secretary need not explicitly approve of conveyances to or condemnations by the United States or its licensees. *Id.; see also United States v. Oklahoma Gas & Electric Co.,* 318 U.S. 206, 211, 63 S.Ct. 534, 536, 87 L.Ed. 716 (1943).

■■■ The defendants' reliance on this case is, however, misplaced. *Tuscarora* does not stand for the proposition that the United States may condemn treaty lands without congressional approval. The majority in *Tuscarora* squarely held that the lands at issue were "not subject to any treaty." *Tuscarora Indian Nation,* 362 U.S. at 123, 80 S.Ct. at 557.[12] The plaintiffs correctly contend that *United States v. Winnebago Tribe of Nebraska,* 542 F.2d 1002 (8th Cir.1976) is controlling on the issue of the government's power to condemn Indian *treaty* lands.

In *Winnebago,* the Eighth Circuit held that the United States, through the Corps

---

veyed without the approval of the Secretary [of the Interior]."

**11.** Originally the United States government based its right to title on the doctrine of discovery. "[D]iscovery gave exclusive title to those who made it." *Johnson,* 21 U.S. (8 Wheat.) at 574, 5 L.Ed. 681. The Court subsequently qualified its analysis regarding the acquisition of Indian land by right of discovery. In *Worchester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), Chief Justice Marshall acknowledged that the recognized right of acquisition by discovery did not itself pass title to the

land. Rather, "[t]his was the exclusive right of purchasing such lands as the natives were willing to sell." *Id.* at 545, 8 L.Ed. 483; *see also* F. Cohen, *Handbook of Indian Law* 50–54 (1983 ed.) (Anglo-Americans' title to Indian lands not based on right of discovery).

**12.** *But see* comprehensive discussion on the issue of congressional takings of Indian treaty land in the dissent by Justice Black, joined by Chief Justice Warren and Justice Douglas. *Tuscarora Indian Nation,* 362 U.S. at 124–142, 80 S.Ct. at 557–567.

of Engineers, was without authority to condemn tribal treaty land without the express approval of the Secretary of the Interior. *Id.* at 1006. The Court noted that nothing in *Tuscarora* sanctioned the taking of treaty lands without congressional authorization. *Id.* This part [13] of *Winnebago* is still good law.

Finding that *Tuscarora* is not controlling, and that congressional approval is indeed required, the Court turns its attention to the defendants' second argument. Here the defendants contend that counsel for the Tribe, by signing the stipulation in question, fulfilled the United States' fiduciary responsibility as trustee over the tribal lands. The defendants emphasize that the United States Attorney's Office, recognizing that it could not represent both the Corps of Engineers and the condemnees, retained impartial counsel for the Tribe.[14] The defendants would have this Court hold that the requirements of the Non-Intercourse Act are satisfied when the sale, disposition, or taking of Indian land is endorsed by the Tribe's private counsel.

■ As noted above, section 177 embodies the federal government's policy to acknowledge and guarantee the Indian's right of occupancy of tribal lands. *Narragansett Tribe of Indians v. Southern Rhode Island Development Corp.*, 418 F.Supp. 798, 803 (D.R.I.1976), (citing cases). Further understanding of the Act can be obtained by taking note of the historical context in which it has operated.

■ The federal government, acting through Congress and the Department of the Interior, has often established nationwide policies for the retention or disbursement of Indian lands. *See, e.g.,* The Indian Reorganization Act of 1934, 25 U.S.C. §§ 461 *et seq.;* The General Allotment Act of 1887, 25 U.S.C. § 349. The Snyder Act of November 2, 1921, authorized the BIA, under the supervision of the Secretary of the Interior, to direct the expenditure of congressional appropriations "for the benefit, care, and assistance of the Indians throughout the United States." 25 U.S.C. § 13. The BIA's broad range of duties includes the administration of Indian lands. *See Cohen* at 141. The history of relations between Indians and non-Indians has too often demonstrated the undesirability of piece-meal alienation of Indian lands. *See id.* at 136–38 (effect of allotment and assimilation on land tenure). The Non-Intercourse Act's government approval requirements serves both to preserve the trust relationship between the government and the Tribe and to insure that management of Indian lands be in keeping with nationwide policies established by the federal government. *See United States v. Hellard,* 322 U.S. 363, 366, 64 S.Ct. 985, 987, 88 L.Ed. 1326 (1944) (detailing federal government's paramount role of establishing policy over Indian restricted lands).

■ It follows that private counsel appointed to represent a Tribe, acting independently as he must of the federal government, Congress and the Secretary of the Interior, should not have the authority to authorize the sale of Indian lands. Accordingly, this Court finds, as a matter of law, that the signature of counsel for the Tribe on the present stipulation does not satisfy the requirements of the Indian Non-Intercourse Act. Accordingly the stipulation in question is void.

---

**13.** *Winnebago* also held that *express congressional authorization* was required to disestablish treaty lands. *Winnebago,* 542 F.2d at 1005. This portion of the opinion has probably not survived the Supreme Court's opinion in *Rosebud Sioux v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (congressional intent to abrogate or modify treaty rights may be "clear from surrounding circumstances and legislative history." *Id.* at 588 n. 4, 97 S.Ct. at 1364 n. 4.) *See* discussion at 597 *infra.*

**14.** "The juxtaposition of plenary power and fiduciary obligation may appear incongruous, but such incongruity is the keystone of Indian-government relations...." E. Dwyer, Land Claims Under the Indian Nonintercourse Act: 25 U.S.C. § 177, 7 B.C.Env. Affairs L.Rev. 259, 263 (1976).

The propriety of the government's subsequent condemnation of the subject property will now be discussed. Disestablishment of Indian treaty lands can only be achieved through congressional abrogation of treaty rights. *See Lone Wolf v. Hitchcock,* 187 U.S. 553, 556, 23 S.Ct. 216, 217, 47 L.Ed. 299 (1903). A complex body of law has evolved concerning the interpretation of statutes which do not provide for abrogation on their face. *See United States v. Dion,* 752 F.2d 1261 at 1265 (8th Cir.1985); *Wilkinson & Volkman,* 63 Calif. L.Rev. at 623–34 (describing five different tests that courts have used in determining whether abrogation has occurred); *see generally* Note, *Indian Title: The Rights of American Natives in Lands They Have Occupied Since Time Immemorial,* 75 Colum.L.Rev. 655 *passim* (1975) (noting that determining limits on the tribal interest derived from Indian title is difficult and complex).

"[W]hen Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress." *United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195 (1909). The congressional intent must be clear in order to overcome the general rule that ambiguities are to be resolved in favor of the Indians. *McClanahan,* 411 U.S. at 174, 93 S.Ct. at 1263. Accordingly, the Courts require that the "congressional determination to terminate [treaty rights] ... be expressed on the face of the act or be clear from the surrounding circumstances

and legislative history." *Rosebud Sioux Tribe,* 430 U.S. at 585, 97 S.Ct. at 1362–63; *Mattz v. Arnett,* 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973).[15] This Court is, of course, compelled to follow [16] *Kneip.* The sovereign, as the party seeking to exercise the right of eminent domain, has the burden of showing its authority. *United States v. Jones,* 109 U.S. 513, 3 S.Ct. 346, 27 L.Ed. 1015 (1883); *United States v. Federal Land Bank of St. Paul,* 127 F.2d 505, 508 (8th Cir.1942); *see generally* 1 *Nichols on Eminent Domain* § 3.213 (1981). In the present case the United States has the burden of showing that some federal statute indicated a congressional intention to abrogate provisions of the treaty setting aside Winnebago reservation land, thereby giving the United States the requisite authority to condemn the land. *See United States v. 2,005.32 Acres of Land,* 160 F.Supp. 193, 197 (D.S. D.1958).

The government has cited four statutes to show the authority under which it is attempting to condemn these parcels of tribal land. First, the defendants contend that the condemnations were authorized by 25 U.S.C. § 357. That statute provides:

> Lands allotted in severalty to Indians may be condemned for any public purpose under the laws of the state or territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee.

---

**15.** In *Dion,* at 752 F.2d at 1262, the Eighth Circuit Court of Appeals adopted a bifurcated method of determining congressional intent to abrogate. In.criminal cases the Court intends to adhere to the "express reference test" first enunciated in *United States v. White,* 508 F.2d 453 (8th Cir.1974). This test may be stated as follows: "[S]tatutory abrogation of treaty rights can only be accomplished by an express reference to treaty rights in the statute or in the statute's legislative history." *Dion,* 752 F.2d at 1265 (referring to *White,* 508 F.2d at 456); *see also Winnebago,* 542 F.2d at 1005 (employing the "express reference test" in a civil action). Nonetheless, the Eighth Circuit has now recognized that the "express reference" test can no longer be used in civil cases. *Dion,* 752 F.2d at

1266–67 (*citing Rosebud Sioux Tribe,* 430 U.S. at 584, 97 S.Ct. at 1361 ("[a] congressional determination to terminate an [Indian reservation] must be expressed on the face of the Act *or be clear from the surrounding circumstances and legislative history*" id. at 586, 97 S.Ct. at 1362) (emphasis supplied); *see also Mattz,* 412 U.S. at 505, 93 S.Ct. at 2258.

**16.** The "surrounding circumstances" test is subject to criticism. The express reference test would appear to lead to greater clarity and more consistent results. *See Dion,* 752 F.2d at 1267 n. 12; *Wilkinson & Volkman,* 63 Calif.L. Rev. at 645–59.

25 U.S.C. § 357.[17] From the face of the statute it is clear that the treaty lands in question cannot be condemned under 25 U.S.C. § 357, and many courts have so held. *Nebraska Public Power District v. 100.95 Acres of Land in Thurston County,* 719 F.2d 956, 961 (8th Cir.1983); *Transok Pipeline Co. v. Darks,* 565 F.2d 1150, 1152 (10th Cir.1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); *City of Stillwater v. An Easement and Right-of-Way for Water Pipeline Purposes in Noble County,* 552 F.Supp. 64, 65 (W.D.Okla.1981), *aff'd,* 691 F.2d 926 (10th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983); *see Eastern Band of Cherokee Indians v. Griffin,* 502 F.Supp. 924, 930 (W.D.N.C.1980); Comment, *Overview of Questions of Access Across Indian Lands,* 10 Land and Water L.Rev. 93, 106 (1975). As the United States owns the fee in tribal lands, the property cannot be condemned without the Secretary of the Interior's approval unless authorized by some other act of Congress. *Minnesota v. United States,* 305 U.S. 382, 386–87, 59 S.Ct. 292, 294–95, 83 L.Ed. 235 (1939).

■■■■■■ The second act upon which the United States relies is the River and Harbor Act of 1945, Pub.L. No. 79–14 (uncodified), reprinted in 59 Statutes at Large 10 (1945).[18] The Act allegedly authorizes the Missouri Stabilization Project, and briefly mentions flood control projects on the "Missouri River between Sioux City, Iowa, and the mouth." *Id.* at 19. The details of

the project are set forth in "House Document Numbered 214, Seventy-Sixth Congress."[19] The Court has reviewed House Document No. 214 in its entirety, and applying *Kneip* finds nothing within the text from which congressional intent to disestablish treaty lands may be inferred.

■■■■■■ The third act cited by the government is an Act of April 24, 1888, codified at 33 U.S.C. § 591. Section 591 empowers the Secretary of the Army to acquire interests in land for river and harbor projects. This provision forms the basis of the condemnation authority possessed by the Secretary of the Army in acquiring ordinary lands for the implementation of flood control projects. Neither the language of the statute nor its legislative history reveals that Congress contemplated the taking of Indian land in these sections.

■■■■■■ Fourth, the government relies on the Flood Control Act of 1944, as amended in 1962 to include non-reservoir projects, 16 U.S.C. § 460d. This statute authorizes recreational facilities at Corps of Engineers' reservoirs and water resource projects. This Act gave general approval to the implementation of designated plans for the Missouri River Basin Program. There is no mention of Indian lands in the Act itself.

**17.** An "allotment" is a term of art in Indian law, describing either a parcel of land owned by the United States in trust for an Indian ("trust" allotment) or owned by an Indian subject to a restriction on alienation in favor of the United States or its officials ("restricted fee allotment"). *Cohen* at 615–16; *see United States v. Clarke,* 445 U.S. 253, 260–61, 100 S.Ct. 1127, 1131–32, 63 L.Ed.2d 373 (1980) (Blackmun, J., dissenting) (describing restricted patent); *United States v. Jackson,* 280 U.S. 183, 184, 50 S.Ct. 143, 144, 74 L.Ed. 361 (1930) (describing trust patent).

**18.** The volumes of the Statutes at Large are "legal evidence" of the laws contained therein and are accepted as proof of those laws in any court of the United States. 1 U.S.C. § 112. "There is no better proof of federal law than the

Statutes At Large, and hence, they are referred to as positive law." *Id.; see generally* M. Cohen, *How to Find the Law,* 120 (7th ed. 1976).

**19.** With regard to river and harbor flood control projects, Congress has often enacted laws adopting a wide variety of House or Senate "documents." These usually consist of Corps of Engineers reports to the Congress detailing proposed projects, their financing, and their relative costs and benefits. When Congress wants a project built, it is common for it to merely adopt the whole report. *See* Letter from Mr. Douglas Misterek to the Court at 2 (March 20, 1985) (filing 47 in CV 82-0-200; filing 58 in C 82-4053; filing 69 in C 82-4052; and filing 71 in CV 82-0-199) (discussing applicability of House Document 214, Seventy-Sixth Congress).

■ Similarly, three other statutes cited by the government,[20] do not mention the taking of treaty lands. Because *Kneip* requires that the intent to disestablish treaty lands be clearly inferable from the statute, its legislative history, or the "surrounding circumstances," the Court finds that the United States was without authority to condemn the Indian lands in question.

Before proceeding to the government's defenses, the Court will address an argument made by the individual allottees in regard to the condemnation actions. The individual allottee plaintiffs contend that they were not notified of the government's 1970 condemnation proceeding against lots 203, 204 and 205. The government argues that all persons whose names appeared in the Register of Deeds office were notified and that notice of the condemnation actions was properly published in the county newspapers. *See Fed.R.Civ.P.* 71A(c)(2).

■ The question presented, then, is whether the government's methods of notice satisfy the requirements of due process. Due process requires that an owner whose property is taken must be given notice. *Walker v. City of Hutchinson*, 352 U.S. 112, 115, 77 S.Ct. 200, 202, 1 L.Ed.2d 178 (1956). Notice by publication is sufficient with respect to those persons who neither live on the land nor are listed in deed or tax records. *Schroeder v. City of New York*, 371 U.S. 208, 212–14, 83 S.Ct. 279, 282–83, 9 L.Ed.2d 255 (1962); *Walker*, 352 U.S. at 116, 77 S.Ct. at 202 (*quoting Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 318, 70 S.Ct. 652, 659, 94 L.Ed. 865 (1950): "Where the names and post office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency.").

■ Counsel for the government asserted that all parties of record were notified before the 1970 condemnations went through and that notification of others, including "unknown owners," was attempted by publication. The allottees have argued that their identities would have been disclosed had the government searched the titles of tracts adjacent to the lands under condemnation. The allottees have not cited any cases that impose this kind of duty on the government, and the Court has found none. Therefore, the Court finds that the individual allottee's rights of due process have not been violated.

The Court will now proceed to consider whether the Indians' claims are barred by the doctrines of res judicata, equitable estoppel, laches or the applicable statutes of limitation.

■ The doctrine of res judicata provides that a party or one in privity with a party who seeks determination of a question which was or should have been litigated and included as part of a final judgment in a court of competent jurisdiction is precluded from litigating that same question at a later time. *C.I.R. v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948); *Lovell v. Mixon*, 719 F.2d 1373 (8th Cir.1983); 1B *Moore's Federal Practice* ¶ 0.405 at 178 (2d ed. 1984). Before applying this doctrine to the facts before the Court, the machinations of the 1972 condemnation cases will be set forth in some detail.

In 1970, the United States Army Corps of Engineers brought suit to condemn lands on the Missouri River to be used for the Oxbow Recreation Lakes, the Snyder Winnebago Complex and the Missouri River Recreation Lakes Project. *See 1,716.18 Acres of Land*, No. 70–C–3015–W at 1. In this action the United States sought to condemn tracts 119 and 210. These tracts are being claimed by the Tribe in the present suits.

The Tribe was served, appeared, answered and filed a cross-claim challenging

**20.** An Act of February 26, 1931, 40 U.S.C. §§ 258a–e (providing for a declaration of taking for the acquisition of interests in land); and the following appropriation acts: Act of December 11, 1969, Pub.L. No. 91–144 (uncodified), *re-* *printed in* 83 Statutes At Large 323 (1969); and an act of August 25, 1972, Public Law. No. 92–405 (uncodified), reprinted in 86 Statutes At Large 621 (1972).

whether the United States had authority to condemn the tribal lands. The United States moved to strike the answer and cross-claim and requested summary judgment on the issue of its authority to condemn. By Order of May 25, 1971, the Court, relying principally on *United States v. 687.30 Acres of Land*, 319 F.Supp. 128. (D.Neb.1970), *appeal dismissed*, 451 F.2d 667 (8th Cir.1971), *cert. denied*, 405 U.S. 1026, 92 S.Ct. 1291, 31 L.Ed.2d 486 (1972) (a companion condemnation case), granted summary judgment and ruled that the government had authority to condemn. The Tribe's interlocutory appeal was denied on the grounds that there was no final judgment. *United States v. 687.30 Acres of Land*, 451 F.2d 667 (8th Cir.1971).

On June 13, 1973, the Tribe and the State of Iowa entered into the stipulation described in detail above. The Tribe did not participate further in this condemnation action. The United States then proceeded with its condemnation suit against the State of Iowa.

Meanwhile, other Winnebago tribal lands along the Missouri River were being condemned. These parcels went to trial on the issues of title and just compensation. Judgments were entered and the Tribe appealed. In *Winnebago*, 542 F.2d at 1002, the Eighth Circuit held that the United States lacked authority to condemn the land. The Tribe is now asking, in essence, for this Court to apply the holding of *Winnebago* to the lands taken in *1,716.18 Acres of Land*.

The defendants contend that the plaintiffs should be precluded from pressing their present claims because of their failure to appeal in the former action. The Tribe cites *United States v. United States Fidelity and Guaranty Co.*, 309 U.S. 506, 60. S.Ct. 653, 84 L.Ed. 894 (1940) (Missouri district court was without jurisdiction to adjudicate a claim against Indian nations and the United States) for the proposition that the doctrine of res judicata does not apply where a prior judgment is void.

■ The rule of *United States Fidelity and Guaranty* does not apply to the present facts. In *United States Fidelity and Guaranty* the Supreme Court addressed a judgment issued by a court acting without subject matter jurisdiction. A judgment entered by a court lacking such jurisdiction is, of course, void. *See, e.g., City of New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953). No such jurisdictional problem exists here.

■ This Court concedes that the May 25, 1971, interlocutory order from which the Tribe appealed, holding that the United States possessed authority to condemn the tribal lands, was constructively overruled by the Eighth Circuit in *Winnebago*. But a judgment is not void simply because it is later determined to be erroneous. *Angel v. Bullington*, 330 U.S. 183, 187, 67 S.Ct. 657, 659, 91 L.Ed. 832 (1947); *Milliken v. Meyer*, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940); *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940); 1B *Moore's Federal Practice* ¶ 0.405(4–1) at 197.

The Supreme Court has recognized that the distinction between void judgments and incorrect judgments is crucial to the application of the res judicata doctrine.

A judgment merely voidable because based upon an erroneous view of the law is not open to collateral attack, but can be corrected only by a direct review and not by bringing another action upon the same cause of action.

*Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 325, 47 S.Ct. 600, 604, 71 L.Ed. 1069 (1927). More recently, in a case factually analogous to the claims now pending before this Court, the Supreme Court held that the res judicata consequences of a final, unappealed judgment on the merits are not altered by the fact that the prior judgment may have been wrong or rested on a legal principle subsequently overruled in another case. *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981); *see also Angel*, 330 U.S. at 187, 67 S.Ct. at

659; *Milne v. Deen,* 121 U.S. 525, 534, 7 S.Ct. 1004, 1007, 30 L.Ed. 980 (1887).

This Court concludes, then, that the Tribe's claims for land condemned in *1,716.18 Acres of Land* are precluded by the doctrine of res judicata. The Tribe's failure to appeal from the final judgment of condemnation is determinative of their present claims. Discussion of the defendants' claims based on estoppel or laches is, therefore, not necessary.

Accordingly,

IT IS ORDERED as follows:

1. Defendants' joint motion to reconsider the Court's denial of their motions for summary judgment (filing 38 in CV 82–0–200; filing 49 in C 82–4053; filing 61 in C 82–4052; and filing 62 in CV 82–0–199) should be and hereby is sustained.

2. Summary judgment in conformity with the foregoing Memorandum should be and hereby is granted.

3. An order for the progression of this matter to trial will be entered this date.