212     622
s218    580

212   622
39SC²428

# York Haven Water & Power Company's Appeal.

*Taxation—Waters—Low water mark—Boundary between York and Lancaster counties—Mansion house—Power company—Act of June 1, 1883, P. L. 51.*

The boundary line between York and Lancaster counties is ordinary low-water mark on the west side of the Susquehanna river. It is not the lowest line ever reached by the water as the result of an extreme drought.

The Act of June 1, 1883, P. L. 51, which provides that where county lines divide a tract of seated land, assessment shall be made in the county in which the mansion house is situated, does not apply where a power house to generate electricity is erected on a part of a farm adjoining a river. The land so used is severed from the rest of the tract, and is no part of nor appurtenant to the farm.

Findings of fact by the court below on an appeal from a tax assessment will not be set aside unless clear error is made to appear.

Argued May 17, 1905. Appeal, No. 121, Jan. T., 1905, by the York Haven Water & Power Company, from decree of C. P. Lancaster Co., Trust Book No. 19, p. 257, dismissing appeal from assessment by county commissioners. Before MITCHELL, C. J., FELL, BROWN, POTTER and ELKIN, JJ. Affirmed.

Appeal from tax assessment.

HASSLER, J., filed the following opinion :

The York Haven Water & Power Company is a corporation organized for the purpose of supplying water and power and of generating electricity by means of water power. It owns a tract of about 400 acres of land in York county, bounded on the east by the Susquehanna river, on which is erected a mansion house, barn and other farm buildings, and a warehouse wherein is kept materials used in and about its business. It has erected a crib dam several thousand feet long in the Susquehanna river, south from which runs a retaining wall, which is part of the dam, at the end of which is erected a power house where the said company generates electricity by means of the water power of the river. This power house, with machinery, is admitted by an officer of the company to be worth $500,000, the amount at which it is assessed.

The dam and most of the retaining wall are in Lancaster county. The county commissioners of Lancaster county and the township authorities of Conoy township claim that the power house and all of the retaining wall are also located in Lancaster county, and the assessor of Conoy township has assessed and returned it as liable for tax in Lancaster county. From this action the York Haven Water & Power Company has taken this appeal.

It contends that its power plant is not taxable in Lancaster county, but, if taxable at all for township and county purposes, which question is not raised by the appeal, it should be taxed in York county.

First, because it is erected on part of the 400-acre tract of land, the mansion house on which is located in York county, and, even though the power plant is located across the boundary line in Lancaster county, the whole must be taxed as one tract, and that in the county where the mansion house is located.

Second, because the power house is located in York county.

The first contention of the appellant is based on the Act of assembly of June 1, 1883, P. L. 51, sec. 1 of which is as follows : " The assessors of the several counties within this commonwealth shall, on seated lands, make the assessment in the county in which the mansion house is situate, when county lines divide the tract." With the exception that this act applies to counties, it is in the exact language of the fifty-ninth sec-

tion of the Act of July 11, 1842, P. L. 321, which applies to townships. The act of 1842 has received a construction by the Superior Court in the case of Com. v. Wheelock, 13 Pa. Superior Ct. 282, which will assist us in applying the act of 1883 to the present case.

In that case, Com. v. Wheelock, A was the owner of a tract of land, part of which, on which was erected the mansion house, was in a township and a small part of which was in a borough. On the part located in the borough was erected a house occupied by the owner's mother and sister, rent free. It was decided that the house in the borough was taxable in the borough and not in the township where the mansion house was located, because it was not used as part of the farm. Judge RICE, in delivering the opinion of the court, says (page 287): " Possibly this house is subject to assessment in the borough, and upon reflection we are inclined to the opinion that this is the correct view. It appears to be in the exclusive occupancy of the owner's mother and sister as a dwelling, and it does not appear it is used as part of, or in connection with, the farm. If the owner had demised it, reserving a rent, it would seem clear that this would be a severance of it from the rest of the farm, which would make it subject to taxation as a distinct tenement. The fact that the owner's mother and sister pay no rent, if such be the fact, does not seem to us to affect the question. The controlling fact is that it is in their exclusive occupancy, and is not used in connection with, or as a part of, the farm."

When the York Haven Water & Power Company erected its power house on a part of this 400-acre farm, if it is on a part of it, that portion of the farm was severed from the remainder. It was no longer used as a part of, nor in connection with, the farm, but for a separate and independent purpose. That is the controlling fact. It does not matter, therefore, where the mansion house is located, if it is in another county, for it would not, under the terms of the act of 1883, draw the portion of the tract on which the power plant is erected to it for the purpose of taxation.

We are of the opinion, however, that [the power plant is not erected on the 400-acre farm]. [1] That farm only extends to low-water mark on the Susquehanna river, and we believe the power house is below low-water mark. The location

of the mansion house on the 400-acre tract could not change the place where the power house is to be taxed. The act of 1883 only applies where the tract is divided by county lines, and does not apply to a separate tract such as we have in this case.

The second contention of the appellant is that the power house is located in York county.

The boundary line between York and Lancaster counties is fixed by the Act of August 19, 1749, 1 Sm. L. 198, as follows : " All and singular the lands lying within the province of Pennsylvania aforesaid to the westward of the River Susquehanna . . . . bounded eastward by the said River Susquehanna." It has been agreed by the parties that low-water mark on the western side of the river marks the boundary line between York and Lancaster counties. This is most favorable to York county, and puts the boundary line as far east as it can possibly be, according to the act of assembly fixing the boundary. The Supreme Court has held that the boundary line on navigable rivers, and the Susquehanna river is made such by act of assembly, is at low-water mark: Stover v. Jack, 60 Pa. 339 ; Poor v. McClure, 77 Pa. 214 ; Freeland v. Pennsylvania Railroad Co., 197 Pa. 529.

Low-water mark is defined in 2 Farnham on Waters, 1462, to be ordinary low-water mark unaffected by drought. That is, the height of the water at ordinary stages of low water. In Stover v. Jack, 60 Pa. 339, Justice AGNEW says : " The defendant alleged it to be an island surrounded by water except at very low stages. The court held that low water, as contradistinguished from high water, does not mean the lowest water the stream may exhibit under special and extraordinary circumstances, and the locus in quo is an island if the water of the river flows around it, at its ordinary stage, unaffected by floods and drought. This is assigned for error, and it brings up for our decision what is meant by low-water mark as a terminus or boundary. . . .

" It is also a well-known fact that in the seasons of extreme low water many of the islands of the principal rivers are not entirely surrounded with water, but may be reached from the shore dry shod. All the circumstances show that to adopt any other rule than ordinary low-water mark, unaffected by

drought, as the limit of title, would carry the rights of riparian owners far beyond boundaries, consistent with the interests and policy of the state, and would confer title where, heretofore, none has been supposed to exist. No one has ever thought that an island cut off from the mainland by the stream in ordinary stages of low water could be added to the land of an adjacent proprietor merely because in the very dry season of the year, the stream had almost disappeared and no water flowed over the intervening dry and sandy or pebbly bed.

" The doctrine that low-water mark is the extremest verge to which a long drought may reduce the stream would lead to such results. Ordinary high water and ordinary low water, each has its reasonably well-defined marks so nearly certain that there is not much difficulty in ascertaining it. The ordinary rise and fall of the stream usually finds nearly the same limits. But to bound title by a mark which is set by an extraordinary flood or an extreme drought would do injustice and contravene the common understanding of the people. We are of the opinion, therefore, that the plaintiff's title was bounded by ordinary low-water mark."

To the same effect see Wood v. Appal, 63 Pa. 210; Poor v. McClure, 77 Pa. 214; Hartley v. Crawford, 81 * Pa. 478.

The testimony submitted to us on this appeal, considered in the light of the rule, as thus laid down, convinces us that [low-water mark in the Susquehanna river, at the point where the power house of appellant company is located, is to the west of said power house]. [2]

On the part of Lancaster county, six witnesses have been called to prove the location of low-water mark at the point where the said power house is erected. Five of them testify that a rock called Ring Rock is the low-water mark. The testimony of one of these witnesses is weakened in his cross-examination, but the remaining four testify quite positively on this point. They were all men who are, and have been familiar with the river for from thirty to fifty years, and have crossed it frequently at this point; two, in fact, have been ferrymen, and all know the location of Ring Rock, and of the power house in question. They testify that Ring Rock is the place to which boats were tied, even in times of very low water,

and are corroborated by one of the witnesses for appellant, who says that even in 1883, when the water reached one of the lowest stages ever known, boats could be tied to this rock if the chain were fifteen or twenty feet long. These witnesses also testify that Ring Rock is from sixty-five to 100 feet west of the power house, and that there is wet and swampy ground to the west of the rock. One witness says that in 1888, when the water was more that ordinarily low, the foreman of the stone quarry, at this point, cut a low-water mark in a rock which marks low water about as far west as Ring Rock is located.

The witnesses also testified that the company owning the paper mill, which was erected here in 1884, filled up the river at or near this point and caused the line of low water to recede further out into the river. They also testified that in order to dig foundations for the power house it was necessary to use cofferdams to keep the water of the river out. All these witnesses testify quite positively that all of the power plant is below water mark and in Lancaster county.

In contradiction of this testimony the appellants have called nine witnesses, some of whom only testify as to the condition of the river at this point during the last few years, or after the paper company had filled up the river as described by the witnesses on behalf of Lancaster county. Three of these nine witnesses have lived in the vicinity for many years, namely, John Ohrendorf, Daniel Repman and Sherman Walker. They testify that at very low water, namely, in 1883 and in 1888, the water had receded to a point from twelve to fifteen feet east of the power plant, but they cannot say where low water mark was in ordinary low water. One other witness testifies that the paper mill company did fill up the creek which flows into the river near this point, but did not fill up the river at the time the mill was erected. Another witness, William J. Childs, an hydraulic engineer, says, by his measurements at the time the power plant was built a year or two ago, low-water mark was east of the power plant. All the witnesses who testify on the subject admit that part of the power plant is east of low-water mark. Some of them testify that it was largely built on dry ground. None of the witnesses, however, fix any mark or monument on the land as the way in which they fix low-water

mark, though several do so, by an imaginary line from the head of Wissler's Island.

As marks or monuments on the ground prevail over courses and distances mentioned in a survey, so the testimony of witnesses who fix low-water mark by a monument or mark in the ground, such as Ring Rock, to which even in times of low water they tied their boats, must prevail over that of witnesses who do not fix it by some such mark or monument. We are led to accept the testimony of the witnesses who fix Ring Rock as low-water mark in preference to the testimony of those witnesses who fix it at twelve or fifteen feet east of the power house, for the additional reason that these latter witnesses fix that point because it was the lowest low-water mark in their observation, and admit that they cannot fix it at ordinary low-water mark. And the higher courts have said that ordinary low-water mark fixes the boundary.

Nor do we think that the testimony of those witnesses who testify to present conditions, and that the power house was built on dry ground, which is a present condition, can affect the location of low-water mark. We find from the testimony that the paper mill company did fill in the river at this point and caused the water line to recede eastward, though we do not think that the testimony shows that it caused it to recede east of Ring Rock in times of ordinary low water. Any natural changes on the edge of a river may change the line of low water, but such is not the case if the changes are made by artificial causes. If such changes could be made by artificial causes islands, separated from the mainland by a narrow stream, might be changed from one county into another by filling up the channel which separates' them from the mainland: Poor v. McClure, 77 Pa. 214, and Ball v. Slack, 2 Wharton, 508.

If, however, the act of the York Haven Paper Company, in filling up the river, could change the line of low water then the act of appellant in raising the water of the river to a point some 400 feet west of the power house, would fix the line at that point. The rule would have to work both ways. The dam of appellant begins at or near the middle of the river, and extends diagonally towards the York county side, near which it narrows, and, by the retaining wall, is run down to the

power house, at which point it is 400 feet wide. The water is thus raised about twenty-four feet above the surface of the river at this point. Judge PEARSON, in the case of O'Connor v. Bigler, 2 Pearson, 219, says, that the surface of the water as raised by the dam became low-water mark. This case was affirmed by the Supreme Court in Bigler v. O'Connor, 2 W. N. C. 180, though the point as to what was low-water mark was not raised on the appeal. We do not think, however, that this case should prevail against the cases we have cited above, which show that artificial causes cannot change the line of low-water mark. We are, therefore, of the opinion that neither the act of the paper mill company, in causing low-water mark to recede eastward, nor the act of the appellant in causing it to extend westward, can change the line of ordinary low water ; and we find, as a fact, that [it is located at Ring Rock, a distance of from sixty-five feet to 100 feet west of the power house, and that, consequently, the power house is in Lancaster county]. [3]

We must, therefore, dismiss the appeal at the cost of appellant.

*Errors assigned* were (1–3) portions of opinions as above, quoting them ; (4) in dismissing the appeal.

*W. U. Hensel,* for appellant.—The preponderance of the testimony is to the effect that the " power plant " itself is above " low-water mark " on the western or York county shore of the Susquehanna river.

In cases of this kind, as in a suit in equity, the Supreme Court, on appeal, is bound to examine the evidence and determine what are the facts, and, if satisfied that facts have been found without proof, or material facts established by the proof have not been found, it follows that there has been plain mistake, for which the finding will be set aside : Worrall's Appeal, 110 Pa. 349; Cauffman v. Long, 82 Pa. 72.

Even if the power plant, or the main part of it is physically located inside low-water mark, it is taxable in York county : Nippenose Twp. v. Bastress Twp., 7 W. N. C. 245; Bennethum v. Eckert, 7 W. N. C. 373; Easton v. Lerch, 2 North.

383; Stahl's Assessment, 1 Lanc. Law Rev. 329; Com. v. Wheelock, 13 Pa. Superior Ct. 282.

Land lying in different counties, though in separate tracts, divided by a river, will be taxed in the county where the owner resides, if it was conveyed by one deed : People v. Wilson, 125 N. Y. 367 (26 N. E. Repr. 454) ; Robson v. Du Bose, 79 Ga. 721 (4 S. E. Repr. 329) ; Udall v. Brooklyn, 19 Johns. 175 ; Luke v. Brooklyn, 43 Barb. 54 ; Atlantic Dock Co. v. Brooklyn, 3 Keyes, 444.

*Bernard J. Myers* and *W. R. Brinton*, with them *N. F. Hall*, for appellee.—It is well settled under the law of Pennsylvania that the Supreme Court will not reverse the court below on a finding of fact, except for gross and palpable error : Piper's App., 20 Pa. 67 ; Baird v. Ford, 152 Pa. 637 ; Warner v. Hare, 154 Pa. 548.

York county was erected under and by virtue of an act of the legislature of the colony of Pennsylvania, passed August 19, 1749, 1 Smith's Laws, 198. This act fixes the boundary of York county, inter alia, as follows, to wit :

" That all and singular the lands lying within the province of Pennsylvania aforesaid to the Westward of the Susquehanna river, Southward and Eastward of South Mountain be erected into a County ; and the same hereby is erected into a County named and henceforth to be called York."

If a boundary is described as running to the bank, no jurisdiction may be acquired over the water : 2 Farnham on Waters, 1487.

Our Pennsylvania decisions clearly sustain the position that low-water mark is not " the lowest kind of low-water mark," but low-water mark means the ordinary low-water mark, not affected by drought but the height of the water at ordinary stages of low water : Stover v. Jack, 60 Pa. 339 ; Poor v. McClure, 77 Pa. 214.

We submit that it is no answer to the assessment of the power plant and dams in Lancaster county, to say that the company owns a mansion house a half a mile away in York county, even though the lands on the tract do adjoin the the power plant : Com. v. Wheelock, 13 Pa. Superior Ct. 282.

OPINION BY MR. JUSTICE FELL, June 22, 1905:

The question raised by this appeal is whether the appellant's power plant should be assessed for taxation in York county or in Lancaster county. The facts that give rise to it are these : The appellant purchased a tract of 400 acres of farm land in York county on which there were a farmhouse, barns and other farm buildings. The eastern boundary of the tract was the Susquehanna river, where it had a frontage of three-fourths of a mile. It constructed crib dams which extend into the river and a race by which the water is conducted to a power house 278 feet long and forty-nine feet wide. It is · agreed that the boundary line between York and Lancaster counties is low-water mark on the western bank of the Susquehanna river. The disputed question of fact is whether the power plant is east or west of this line. All of the witnesses agreed that a part of the plant is east of low-water mark. The court found that the whole of it is east.

The conflict in the testimony arose mainly from the different views of the witnesses as to what should be considered low-water mark, whether the lowest line the water has ever been known to reach or as expressed by some of them "the lowest kind of low-water mark," or the line of ordinary low water, not the effect of an extreme drought. The learned judge, following the decision in Stover v. Jack, 60 Pa. 339, held that the low-water mark was the line to which the water receded at ordinary states of low water, and ascertained the location of this from the testimony of witnesses who had observed the river for a long period of time and who fixed the line of low-water mark by monuments on the ground. The case was considered and decided on right principles both in determining what was low-water mark and the weight of the evidence. We should not set aside the finding of fact by the court unless convinced of clear error. From a careful review of the testimony we find nothing to lead us to doubt its correctness.

It is, however, contended that if the power plant is located east of the line of York county, it should be assessed in that county as a part of the tract on which the mansion house and other buildings are located. This contention is based on the Act of June 1, 1883, P. L. 51, which provides that where county lines divide a tract of seated land, the assessment shall be

made in the. county in which the mansion house is situated. The act does not apply to this case. The appellant was incorporated for the purpose of supplying water and power and of generating electricity by means of water power. By the purchase of the farm it secured valuable water rights and has utilized them by the construction of a dam in the river and a race and power house on its margin. The improvements are valued at $500,000 and occupy only a few acres at one side of the tract. These acres are practically severed by their use from the rest of the tract and are applied to a new and entirely distinct use wholly unconnected with the use to which the remainder is put. They are not a part-of nor appurtenant to the farm. The 59th section of the Act of July 11, 1842, P. L. 321, which contains a similar provision as to lands divided by borough or township lines, was held not to apply to a house in a borough not used in connection with nor as a part of a farm : Commonwealth v. Wheelock, 13 Pa. Superior Ct. 282.

The order of the court is affirmed at the cost of the appellant.