101 RANCH, a North Dakota Partnership, consisting of Steve Ward, Imogene Christensen and Claire Engelhardt; Carlyle Brye; Arnold Yri and Vernyll Yri; Ruby Martinson; Miles Maddock and Dorothea Maddock; Olaf Solheim and Mabel Solheim; Minnie Johnston; and Francis P. Schneider and Gloria Schneider; Gail Anderson; Gerald Tofsrud; Mabel Martinson; Helen Martinson; Hulda Martinson; and Lutheran Bible Institute of Seattle, Plaintiffs,

v.

UNITED STATES of America, Defendant,

and

State of North Dakota and Board of Directors, Garrison Conservancy District, Intervenors.

No. A2–81–89.

United States District Court, D. North Dakota, Northeastern Division.

Oct. 28, 1988.

Report of Special Master April 22, 1988.

Frank T. Knox, Lanier, Knox & Olson, Fargo, N.D., for plaintiffs.

Bradley Jackson, Andrew Walch, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., (Margot Zallen, Office of Reg. Solicitor, Dept. of Interior, Denver, Colo., Gary Annear, U.S. Atty., Fargo, N.D., of counsel), for defendant.

Murray G. Sagsveen, Zuger & Bucklin, Bismarck, N.D., for intervenors.

## MEMORANDUM AND ORDER

BENSON, Senior District Judge.

This case was referred to a special master pursuant to Rule 53 of the Federal Rules of Civil Procedure. The Honorable Karen K. Klein, United States Magistrate for the District of North Dakota, was designated to serve as master pursuant to 28 U.S.C. § 636(b)(2). The special master conducted an evidentiary hearing on February 2–5, 1987. Thereafter the matter was briefed and on April 22, 1988, the special master's report was filed with the court. See F.R.Civ.P. 53(e)(1). Objections to the report have been filed by the parties. The United States moved that the report be adopted in part and vacated in part.

On June 27, 1988, at a hearing before the court, the parties and intervenors were given an opportunity to be heard. The court accepts the Master's findings of fact and the report in whole, except as hereinafter modified:

## MODIFICATIONS

1. The third full sentence on page two is modified to read: "The plaintiffs claim ownership of the lands by virtue of various quiet title judgments entered while the West Bay was dry or by virtue of tax payments, adverse possession, and/or quitclaim deed from the State of North Dakota."

2. The fourth full sentence on page five of the report is modified to read: "On July 7, 1971, the GDCD conveyed its interest in the greater part of the land below the meander line of Devils Lake to the United States by quitclaim deed."

3. On page one, the number "2904a" is corrected to read "2409a;"

On page two, the word "quite" is corrected to read "quiet;"

On page four, the word "Untied" is corrected to read "United."

4. Those parts of pages nineteen and twenty of the report relating to the discussion and determination of the

ordinary low water mark are deleted. The parties are in agreement that a determination of the location of the ordinary low water mark is not an issue in this case.

## PLAINTIFFS' OBJECTIONS TO THE MASTER'S REPORT

Plaintiffs assert that the report fails to address the legal issues relating to their claims as set out in pages seven and eight of the report. The disposition of plaintiffs' claims is implicit in the findings and recommendations of the Master.

The Master found the plaintiffs' lands are riparian in nature. It is clear from the arguments of plaintiffs' counsel at the hearing on the report that plaintiffs do not contest this finding. They do, however, disagree with the legal effect of the finding. They accept the benefits of the reliction but contend, in effect, that their quiet title actions insulate them from the burdens of submergence.[1]

■ The court gives full faith and credit to the quiet title judgments. 28 U.S.C. § 1738. The quiet title judgments do not, however, alter the fundamental riparian nature of the lands. The judgments affirm plaintiffs' title to the relicted lands as of the time they were entered. The State apparently had no reason to appear in the actions because it had lost its possessory interest in the land through reliction. Neither the quiet title action nor the December 7, 1949 quitclaim deed relieved the plaintiffs from the burden of submergence.

That which the State, as lake bed owner, may have lost by reliction has been recovered by the present lake bed owner through submergence up to the present ordinary high water mark, which is approximately 1,427 feet. The plaintiffs' lands gained through reliction and subsequently lost through submergence up to the ordinary high water mark were described in the State's July 7, 1971 quitclaim deed to the United States. Plaintiffs argue that if the lands covered by the State's quitclaim deed to the United States in 1971 were not submerged at that time the United States acquired nothing by the deed. That argument is without merit.

The 1971 quitclaim deed from the State to the United States described lands "lying below the meander line." The court has previously determined that at time of statehood the meander line was the ordinary high water mark. It has also been determined that Devils Lake was a navigable lake at the time of statehood and pursuant to the equal footing doctrine, the state acquired title to the bed of the lake. The adjacent landowners acquired ownership of their land by government patent. The land at all times retained its riparian nature. As the water level receded the adjacent landowners acquired title to that part of the lake bed uncovered by the receding water, subject to the State's latent submergence interest. When the level of the water advanced, the plaintiffs' title to the land which they had acquired under the doctrine of reliction was divested by submergence and reacquired by the lake bed owner.[2]

1. An objection has been made to the Magistrate's failure to specifically discuss a parcel of land in sections twenty-four and twenty-five of Township 153 North, Range 67 West, covered by a quitclaim deed dated December 7, 1949 from the State. The court finds the State delivered the deed pursuant to a July 21, 1949 agreement between the State and a plaintiff's predecessor in interest. The agreement stated that the two parties owned uplands across from each other on a small arm of the West Bay. The agreement indicated that "accreted" lands had formed between the parties' properties. (The lands were in fact relicted). The agreement stated that "it [was] practically impossible to accurately determine the relative proportion of said accretions which belong to the said [S]tate and to Ralph D. Ward." The purpose of the

agreement was "to accomplish an amicable partition of said accretions." The court finds that the legal principles and result applicable to the other lands in this case equally apply to the 1949 quitclaimed land.

2. The Master's report on page eight identifies certain of the plaintiffs who base their claims to land below the ordinary high water mark on adverse possession and payment of taxes. Plaintiffs' adverse possession claims against the State are foreclosed by *Smith v. Anderson,* 144 N.W.2d 530, 535 (N.D.1966). There the North Dakota Supreme Court refused to apply the North Dakota adverse possession statute against a municipality. The court's reasoning in *Smith* is equally applicable to cases involving adverse possession claims against the State.

The 1971 quitclaim deed conveyed to the United States the lake bed nearest West Bay.

The court has accepted the Special Master's finding that the largest portion of West Bay is higher than 1,423 feet. The court further finds that the maximum elevation of the water in Devils Lake in 1971 was 1,421.1 feet. *See* North Dakota Exhibit 408, Volume 3 at 46. Thus, West Bay was dry in 1971 and presumably subject to cultivation. The ordinary high water mark is now found to be approximately 1,427 feet. The net effect of the deed is that it conveyed the entire lake bed, as it existed in 1971, to the United States.

On the adoption of the Master's Report, as modified, the court finds that the nature of the rights or interests conferred by section 47–01–15, North Dakota Century Code, need not be determined in this case. The court holds that the location of the ordinary low water mark also need not be determined. The court further holds that plaintiffs' title to the land in question, except for such rights as the State may have conferred on the plaintiffs pursuant to section 47–01–15, North Dakota Century Code, does not extend below the ordinary high water mark.

### ORDER

IT IS ORDERED that plaintiffs' motion for summary judgment filed January 12, 1987, is denied.

IT IS FURTHER ORDERED that judgment be entered decreeing that:

1. The doctrine of reliction and submergence applies to West Bay of Devils Lake;
2. The ordinary high water mark of Devils Lake is ambulatory;
3. The present ordinary high water mark is 1,427 feet;
4. Title to the patented and relicted lands adjacent to and above the present ordinary high water mark bounding the lands described in that certain quitclaim deed dated July 7, 1971, wherein the Garrison Conservancy District, an agency of the State of North Dakota, appears as grantor and the United States of America as grantee, is presently held by the adjacent landowners as their interests may appear;
5. The July 7, 1971 quitclaim deed conveyed the Garrison Conservancy District's interest in the lake bed land below the ordinary high water mark, as it existed in 1971, to the United States;
6. Title to the lands below the ordinary high water mark bounding the lands described in the said quitclaim deed is held by the United States of America subject to the rights conferred upon the adjacent landowners by section 47–01–15 of the North Dakota Century Code;
7. The July 7, 1971 deed described herein, and the resolution accompanying the deed were recorded in the office of the Register of Deeds in Benson, Nelson and Ramsey Counties, North Dakota, as follows:

Benson County

Resolution: Book 20 of Misc. at page 138
Deed: Book 62 of Deeds at page 377

Nelson County

Resolution: Book 207 of Misc. at page 398
Deed: Book 208 of Deeds at page 98

Ramsey County

Resolution: Book 19 of Misc. at page 545
Deed: Book 76 of Deeds at page 535

Costs shall not be awarded to the parties or the intervenors.

### REPORT OF SPECIAL MASTER

KAREN K. KLEIN, United States Magistrate.

This is a quiet title action brought by the plaintiffs against the United States, pursuant to 28 U.S.C. § 2409a. Exclusive original jurisdiction of the case rests with this court. 28 U.S.C. § 1346(f). The case was referred to the magistrate, who was ap-

pointed to serve as a special master pursuant to 28 U.S.C. § 636(b)(2), Rule 53 of the Federal Rules of Civil Procedure, and Rule 28(c)(6) of the Local Rules of the United States District Court for the District of North Dakota. The reference order directed the magistrate to conduct an evidentiary hearing and to make findings of fact and conclusions of law. *101 Ranch v. United States*, Civil No. A2-81-89 (D.N.D. Sept. 30, 1985). An evidentiary hearing was begun on February 2, 1987, and concluded on February 5, 1987. Preparation of the transcript and two rounds of briefing have now been completed. This report contains the magistrate's findings of fact and conclusions of law. *See* F.R.Civ.P. 53(e).

## INTRODUCTION

This case involves a dispute over the ownership of lands below the meander line of West Bay of Devils Lake. The plaintiffs claim ownership of the lands by virtue of various quiet title judgments entered while the West Bay was dry or by virtue of tax payments and/or adverse possession. The United States resists the plaintiffs' allegations, claiming ownership of the lands by virtue of a quit claim deed given to it by the State of North Dakota. The State of North Dakota and the Garrison Diversion Conservancy District (GDCD) argue that the State had no interest in the land subject to the quiet title judgments to convey to the United States, but that it did have an interest to convey in the lands claimed by the plaintiffs via adverse possession and/or tax payments.

## FACTUAL AND PROCEDURAL PERSPECTIVE

### 1. Devils Lake

Devils Lake is a large terminal lake in northeastern North Dakota. The lake is part of the 3,800 square mile Devils Lake Basin. ND exhibit no. 255 at 2. Its water level and surface area have varied greatly over the past several thousand years. ND exhibit nos. 253 at 4-6; 255 at 9-11. Since the retreat of the Pleistocene glaciation, the lake's highest level has been estimated to be 1,453 feet above sea level. ND exhibit no. 255 at 9. The 1830 lake level has been estimated at 1,441 feet above sea level. Recorded water levels date from 1867. In 1887, the level was 1,438 feet above sea level. ND exhibit no. 255 at 11. At that level, the lake's surface was 140 square miles, *id.*, and West Bay was a large, open body of water with depths in excess of fifteen feet. ND exhibit no. 250 at 1.

From 1867 to 1901, the lake levels were sporadically recorded. The sporadic records show that the lake level steadily declined during that period. ND exhibit 404. In 1901, the United States Geological Survey established a gauge at Devils Lake. ND exhibit no. 255 at 11. From 1901, the lake levels have been regularly observed and recorded. *Id.* After 1901, the lake level continued to steadily decline. In 1940, the lake reached a low of 1,400.9 feet above sea level. ND exhibit no. 250 at 1. At that level, the lake was a "shallow brackish body of water covering 10.2 square miles." *Id.*

Long before the low in 1940, however, West Bay became dry. The elevation of the largest portion of West Bay subject to this suit is higher than 1,423 feet above sea level. Tr.Vol. III at 45-46; Def't's exhibit nos. 303A & 303D. In 1909, the lake stayed below 1,423 feet above sea level, reaching a high of 1,422.6 feet. ND exhibit no. 408; Tr.Vol. III at 46. The lake did not rise above 1,423 feet until 1974. ND exhibit no. 408; Tr. Vol. III at 46. The result was that from 1909 through 1973 West Bay was free of standing water from the lake. Tr.Vol. III at 446-47.

After reaching its low in 1940, the lake level began to rise. The lake has continued to rise steadily since 1940. In 1983, the lake reached a high level of 1,428.1 feet above sea level. In 1986, the lake level ranged from 1,427.3 feet to 1,425.8 feet above sea level.

### 2. Surveys of Devils Lake

Devils Lake became the property of the United States in 1811 by treaty with England. Non-federal ownership of the land around Devils Lake began with the federal

government surveys of Devils Lake in 1875 and 1883. Deft's exhibit nos 301A–301G. These surveys were required to be completed before the land could be conveyed to others. The surveys established, among other things, the meander line of the West Bay. *See* Deft's exhibit no 303A (showing approximate location of meander line). Meander lines define the sinuosities of the perimeter of a body of water and are used as a means of ascertaining the quantity of land embraced in a survey. Meander lines are not the sinuosities of property. *Gardner v. Green*, 67 N.D. 268, 279–80, 271 N.W. 775, 781 (1937).

A dependent resurvey, a retracement and reestablishment of the lines of the original survey, of Devils Lake was conducted in 1971. *See* Deft's exhibit nos. 301H–301K.

The survey results are important for several reasons. First, the district court has ruled that the meander line was the ordinary high water mark of Devils Lake at the time of North Dakota's statehood. Second, patented lands are considered riparian or remote depending upon their status at the time of the original survey. *United States v. 2,134.46 Acres of Land*, 257 F.Supp. 723, 728 (D.N.D.1966), *aff'd sub nom. Peterson v. United States*, 384 F.2d 664 (8th Cir. 1967).

### 3. Garrison Diversion Unit

In 1965 Congress authorized the Garrison Diversion Unit (GDU) water project in North Dakota. *Act of August 5, 1965*, Pub.L. No. 89–108, 79 Stat. 433 (1965). The legislation authorizing the GDU provided, in part, as follows:

> [T]he construction of a development providing for the irrigation of two hundred and fifty thousand acres, municipal and industrial water, fish and wildlife conservation and development, recreation, flood control, and other project purposes shall be prosecuted by the Department of the Interior substantially in accordance with the plan set out in the Bureau of Reclamation report dated November 1962 (revised February 1965) supplemental report to said House Document Numbered 325.

*Id.* The February 1965 report referenced in the GDU legislation contemplated federal acquisition of 146,530 acres of land and water for fish and wildlife purposes. *See* ND exhibit no. 265 at 12–14. This included acquisition of 15,800 acres of water and marsh and a total of 33,960 acres of land in the West Bay of Devils Lake. *Id.* at 14.

On January 26, 1966, the GDCD Board of Directors and the United States entered a contract, Master Contract No. 14–06–600–8948. ND exhibit no. 259. The Master Contract provided that the GDCD would administer certain recreation and fish and wildlife lands and assume certain costs associated with the areas or facilities. ND exhibit no. 259 at 13 (paragraph 18(a)). The Master Contract provided that the GDCD could accomplish its assumption of costs by "donation or causing donation of lands or interests in lands needed for recreation and fish and wildlife enhancement purposes. *Id.* at 13 (paragraph 19). In 1967 the North Dakota Legislature empowered the GDCD to "donate and convey to the United States ... lands owned by the state of North Dakota." N.D.Cent.Code § 61–11–24(08) (1985). In 1967, the United States and the GDCD signed a supplemental agreement. ND exhibit no. 264. It provided for the eventual transfer of all lands below the meander line of Devils Lake to the United States. ND exhibit no. 264 at 3. (paragraph 3(b)). On July 7, 1971, the GDCD conveyed its interest in land below the meander line of Devils Lake to the United States by quit claim deed. ND exhibit no. 258. That deed forms the basis of the plaintiffs' claims.

### 4. Procedural History

The plaintiffs filed this case on June 2, 1981, alleging that the GDCD's quit claim deed to the United States created a cloud on their title to lands below the meander line of the West Bay of Devils Lake. The State and GDCD intervened in this case pursuant to the judgment entered in *Board of Directors, Garrison Conservancy District v. Andrus*, Civil No. A2–80–22 (D.N.D. Feb. 8, 1980). That case involved the United States' failure to give credit to

the State for the acreage transferred in West Bay. The court denied the present plaintiffs' motion to join that lawsuit. As a part of the judgment in the case, however, the court ordered GDCD to "join in any action brought for or against the United States in a court of competent jurisdiction to support its claim of title to such lands being in the State of North Dakota immediately prior to the July 7, 1981, quit claim deed to the United States." *See* ND exhibit no. 410 at A–15.

To date, the district court has ruled on three summary judgment motions in this case. The court has ruled that the "West Bay of Devils Lake was navigable-in-fact at the time of statehood. Accordingly, the State of North Dakota acquired the bed (i.e., all land below the ordinary high water mark) of West Bay as an incident of statehood." *101 Ranch v. United States*, No. A2–81–89 (D.N.D. Dec. 21, 1981). The court has also ruled as follows:

The ordinary high water mark for West Bay, Devils Lake at statehood is the meander line, as illustrated in the following plats of dependent resurveys by the Bureau of Land Management, United States Department of the Interior:

1. Township 152 North, Range 66 West, of the Fifth Principal Meridian, North Dakota, dated December 30, 1970.
2. Township 153 North, Range 66 West, of the Fifth Principal Meridian, North Dakota, dated December 18, 1972.
3. Township 152 North, Range 67 West, of the Fifth Principal Meridian, North Dakota, dated December 18, 1972.
4. Township 154 North, Range 67 West, of the Fifth Principal Meridian, North Dakota, dated December 18, 1972.

*101 Ranch v. United States*, No. A2–81–89 (D.N.D. Sept. 17, 1982) (order granting partial summary judgment).

On September 30, 1985, the district court entered a third order, which denied a motion for summary judgment. By that order, the district court appointed the magistrate as special master and referred the case to her. In the order, the court identified the following undecided factual issues:

1. Whether the rise and fall of the water level at West Bay has been such that the doctrines of accretion and reliction apply;
2. Whether the ordinary high water mark at West Bay which existed at the time North Dakota acquired statehood has moved over time;
3. Whether the ordinary high water mark and the ordinary low water mark were and are presently ascertainable.

*101 Ranch v. United States*, No. A2–81–89 (D.N.D. Sept. 30, 1985). The court further identified the following possible issues for evidentiary hearing or legal argument:

1. Whether the plaintiffs or their predecessors in interest received patents to land riparian to Devils Lake;
2. Whether the State's public trust doctrine is applicable to the case;
3. Whether state or federal common law is applicable to determine the boundary of the land at issue; and
4. Whether a quiet title action brought by individuals relating to land in which the State may have an interest is res judicata against the State when the State, named as a defendant and having received notice, failed to respond to defend the action.

*Id.*[1]

5. Parties

A. Plaintiffs

The lands conveyed to plaintiffs or their predecessors in interest by United States Patent were adjacent uplands of the meander line of West Bay of Devils Lake as shown by the original surveys, and thus are riparian in nature. The plaintiffs also claim ownership of the lands below the meander line in West Bay. They allege that the 1971 quit claim deed from the State to the United States created a cloud on their titles to the West Bay land. In

---

**1.** The plaintiffs filed a summary judgment motion on January 12, 1987, less than a month before the magistrate conducted the evidentiary hearing. On the first day of the evidentiary hearing the motion had not been decided, and the magistrate conducted the hearing as though the motion had been denied. That motion is still pending.

making their arguments, the plaintiffs note that they or their predecessors in interest have used West Bay for farming and ranching since the early 1900s. *See, e.g.,* Tr.Vol. I at 45, 72, 92, 119, and 129. They also point out that they or their predecessors in interest have paid taxes on the lands.

The plaintiffs claim title to lands below the meander line of West Bay from two sources. First, 101 Ranch; Lutheran Bible Institute; Arnold Yri and Vernyll Yri; Miles Maddock and Dorothea Maddock; Gail Anderson, Gerald Tofsrud, Mabel Martinson, Helen Martinson, Astrid Martinson, and Hulda Martinson, claim title to lands below the meander line by virtue of quiet title judgments entered between 1925 and 1940.[2] The State was a party defendant in those quiet title actions, but did not appear. Default judgment was entered quieting title in favor of the plaintiffs or their predecessors in interest and against the State. The other plaintiffs, Olaf Solheim and Mabel Solheim, Minnie Johnston, and Francis P. Schneider and Gloria Schneider do not have quiet title judgments in their claim of title. They claim title to lands below the meander line by virtue of adverse possession and tax payments by them or their predecessors in interest.

In post-hearing briefs, the plaintiffs identify four issues to be decided:

1. Whether this court must give full faith and credit to the quiet title judgments obtained by the plaintiffs or their predecessors in interest.

2. Whether the quiet title judgments collaterally estop the United States and the State from challenging plaintiffs [sic] title to the lands below the meander line.

3. Whether the plaintiffs or their predecessors in interest acquired title to lands below the meander line by openly and notoriously using the land under color of title and by paying taxes on the land for ten years.

4. Whether North Dakota Century Code 28–01–01, titled "Actions relating to real estate brought by State of North Dakota—Limitations," estops the United States and the State from challenging the plaintiffs' title to the lands below the meander line.

*See* Docket no. 182 at 1–2 (Plaintiff's Post-trial Brief). The plaintiffs maintain that their titles to lands below the meander line are superior to any title claimed by the United States or the State. They ask the court to "adjudicate the plaintiffs to be the owners of the land disputed in this case in fee simple for themselves, their heirs, successors and assigns, forever."

**B. Defendant**

The United States is the defendant because it possesses the quit claim deed which allegedly created the cloud on the plaintiffs' title to West Bay land. The United States obtained the deed as part of the GDU project. It argues that the issues to be decided are stated in the district court's last summary judgment order and that the "common law principles governing the rights of riparian owners and the location of riparian boundaries, ... control the title and boundary questions presented." Docket no. 183 at 3 (Defendant's post-trial brief). The United States argues that "Plaintiffs are entitled to an order declaring fee title in them to the lands described in the patents issued to plaintiffs' predecessors, and to those accreted and relicted lands above the present ordinary high water mark along the shore of the West Bay." Docket entry no. 183 at 4 (Defendant's post-trial brief).

**C. Intervenors**

The State and the GDCD have intervened pursuant to the judgment entered in *Board*

---

2. After West Bay became dry in the early 1900s and the adjacent landowners began to farm the lands in the former lakebed, they reached an agreement apportioning the lands below the meander line among them in a fashion deemed to be more equitable than strict extension of meander line frontage, and they commissioned a survey to establish the boundaries of the apportioned tracts. In furtherance of this agreement, some owners exchanged quit claim deeds to the apportioned tracts. Certain of these owners then commenced actions to quiet title to the tracts conveyed to them.

*of Directors, Garrison Diversion Conservancy District v. Andrus,* No. A2–80–22 (D.N.D. Feb. 8, 1980). The State delivered the quit claim deed to the United States that allegedly created a cloud on the plaintiffs' title.

The State's position in this case is arguably an intermediate position between the plaintiffs and the defendant. The State acknowledges validity of the quiet title judgments and maintains that at the time of its conveyance to the United States, it had no interest in those lands that were subject to the quiet title judgments. It argues, however, that as to those lands claimed by adverse possession and tax payments, the State continued to own those lands up to the ordinary high water mark and has quit claimed its interest to the United States. It further argues that the ordinary high water mark is the meander line as determined by the original survey.

### APPLICABLE LAW

In applying the law to this case, one problem is readily apparent. The parties do not agree on the issues presented or the legal theories which govern the resolution of this dispute. The plaintiffs argue that this case requires application of the principle of full faith and credit for state court judgments and of the law of adverse possession. The defendant argues application of the law of riparian rights, including the doctrines of reliction and submergence. The intervenors' approach would require the application of parts of both legal approaches.[3]

### 1. General Principles

■ The starting legal principle is that a state acquires, as an incident of statehood, title to the beds of all navigable bodies of water within its boundaries, up to the ordinary high water mark of those bodies. *See Utah Division of State Lands v. United States,* 482 U.S. 193, 107 S.Ct. 2318, 2320, 96 L.Ed.2d 162 (1987) ("Because all subsequently admitted States enter the Union on an 'equal footing' with the original thirteen States, they too hold title to land under navigable waters within their boundaries upon entry into the Union."), *citing Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845); 43 U.S.C. § 1311. The district court has held that Devils Lake was navigable at the time of North Dakota statehood. *101 Ranch v. United States,* No. A2–81–89 (D.N.D. Dec. 21, 1981) (order granting partial summary judgment). The district court has further ruled that, at the time of North Dakota's statehood, the ordinary high water mark was the meander line. *101 Ranch v. United States,* No. A2–81–89 (D.N.D. Sept. 17, 1982) (order granting partial summary judgment, at 1). Consequently, the State acquired title to the bed of Devils Lake up to the meander line.

■ The land acquired by plaintiffs or their predecessors in interest through United States or State patent[4] was adjacent to the ordinary high water mark of West Bay at the time of the original survey. Therefore, these lands are riparian in character.[5]

---

3. The variance in the parties' positions is summarized colorfully by the following quote from a similar Florida case:

    A transcript of 334 pages and many exhibits reflect the usual conflicts to be expected in a case of this kind. As counsel have looked at this composite of proof the same has taken on proportions as differently as the prismatic bands. Their inferences are in large part antipodal; and what is the controlling law does not find a common ground in the minds of these gentlemen.

    *Municipal Liquidators, Inc. v. Tench,* 153 So.2d 728 (Fla.App.), *cert. denied,* 157 So.2d 817 (Fla. 1963).

4. Carlyle Brye's patented lands are former "school lands." They were ceded by the United States to the State of North Dakota at the time of statehood for the use and aid of the public schools. Carlyle Brye purchased the land from the State under a contract and acquired a patent from the State upon completion of the terms of the contract.

    The other plaintiffs' lands were patented by the United States.

5. This case involves littoral lands and rights. Littoral lands border an ocean, sea, or lake. *Alexander Hamilton Life Insurance Co. v. Virgin Islands,* 757 F.2d 534, 538 (3rd Cir.1985). Riparian lands border rivers or streams. The principles applicable to littoral and riparian lands are the same. *Id.* at 538 n. 5. For simplicity's sake, the court will use the term "riparian" throughout this report.

*See United States v. 2,134.46 Acres of Land,* 257 F.Supp. at 728.

Title to riparian land carries unique benefits and burdens. It carries the benefit of reliction. Relicted land is land that was covered with water, but which is uncovered by the imperceptible recession of the water. *Bear v. United States,* 611 F.Supp. 589, 593 n. 2 (D.Neb.1985), *affirmed,* 810 F.2d 153 (8th Cir.1987).[6]

■ When relicted lands are created, the upland owner takes title to those lands and is not accountable for the gain. *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 386, 97 S.Ct. 582, 594, 50 L.Ed.2d 550 (1977). In essence, the doctrine of reliction causes the title to riparian land to be ambulatory. *California ex rel. State Lands Commission v. United States,* 805 F.2d 857, 864 (9th Cir.1986), *cert. denied,* — U.S. —, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987). This is consistent with the principle that land conveyed with water boundaries is expected to continue to be so bounded. *See, e.g., Bear,* 611 F.Supp. at 594.

■ Conversely, riparian land is burdened by submergence. Submergence is the converse of reliction and involves the imperceptible rise in water level so that land formerly free of water becomes submerged. *Municipal Liquidators, Inc. v. Tench,* 153 So.2d 728 (Fla.1963). In such case, title to submerged lands reverts to the State, *id.,* and the loss is uncompensated. *Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 325–26, 94 S.Ct. 517, 525–26, 38

L.Ed.2d 526 (1973), *overruled on other grounds, Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977).[7]

■ The principles of reliction and submergence are based upon changes in water level which are gradual and imperceptible. The intervenors argue that the doctrine of reliction does not apply to the West Bay of Devils Lake because the changes in water level have not been gradual and imperceptible. The intervenors rely on the litigation involving the boundary of the Great Salt Lake. In that case, the special master could not find that the waters of the Great Salt Lake had receded gradually and imperceptibly. Consequently, the special master concluded that the doctrine of reliction did not apply to the lake and that the State of Utah retained ownership of the bed of the lake up to the OHWM. *Utah v. United States,* No. 31, report of special master (U.S. Oct. term 1967).

The intervenors' argument is without merit. They have failed to present evidence indicating that the water did not recede from West Bay gradually and imperceptibly. Consequently, there is no basis to find that the lands in West Bay were not subject to reliction. The intervenors fail to note the truly unique situation presented by the Great Salt Lake. The shorelines of Great Salt Lake are so gently sloped that the average annual change in water level, about .69 feet, caused the inundation of approximately 50,000 acres. There is simply no basis for applying the

---

6. A factual issue identified by the district court is "[w]hether the rise and fall of the water level at West Bay has been such that the doctrines of accretion and reliction apply." The terms accretion and reliction are often used interchangeably. *Bear,* 611 F.Supp. at 593 n. 2. The terms are distinct, however. Accretions or accreted lands are additions to realty from gradual deposits by water of solid material, whether mud, sand, or sediment, producing dry land which before was covered by water, along banks of navigable or non-navigable bodies of water. *Id.* The law applying to accretions also applies to relictions. *See Omaha Indian Tribe v. Wilson,* 614 F.2d 1153, 1157–58 (8th Cir.1980), *following remand, cert. denied,* 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 128, 465 U.S. 1025, 104 S.Ct. 1281, 79 L.Ed.2d 684 (1984); *Bear,* 611 F.Supp.

at 593 n. 2. The doctrines of accretion and reliction do apply to terminal lakes, such as Devils Lake. *California ex rel. State Lands Commission,* 805 F.2d at 864–65. *See also Banks v. Ogden,* 69 U.S. (2 Wall.) 57, 17 L.Ed. 818 (1865).

7. Many more cases discuss the principle of erosion than of submergence. While submergence is the opposite of reliction, erosion is the converse of accretion. Erosion is the washing away of land by forces of water. Accretion is the gradual and imperceptible building of land by deposition of material. The principles of erosion and submergence are subject to similar law. *See Municipal Liquidators, Inc., supra.*

reasoning of that case to the present. Plaintiffs, on the other hand, argue that the doctrine of submergence does not apply to this case. They argue that such riparian principles apply "only *when the water forms one of the boundaries of the land referred to.*" Plaintiffs' Post-trial brief, Docket entry no. 182 at 20. They quote the following language from a recent Ninth Circuit decision:

> The doctrines of accretion and reliction on the one hand, and avulsion on the other provide a framework for resolving boundary disputes arising from the dynamic nature of water. When a water line that *constitutes a property boundary* changes gradually and imperceptibly by the gradual deposit of solid material on its shore (accretion), or by gradual recession (reliction), the property boundary changes with it.

*California, ex rel. State Lands Commission,* 805 F.2d at 864 (emphasis added).

The plaintiffs' West Bay land was not bounded by water for many years. Alone, this fact fails to establish a basis for not applying the principle of submergence. The plaintiffs' land is riparian in character. *See United States v. 2,134.46 Acres of Land,* 257 F.Supp. at 728. They or their predecessors in interest have benefitted from the land's riparian status and obtained title to the disputed lands by virtue of reliction. The plaintiffs have not presented any reason for applying the law to benefit riparian lands by reliction, but not burden it under the doctrine of submergence. The plaintiffs' position is a one way street in favor of privately-held relicted lands, which fails to recognize the State's converse right to submerged land which it would hold for the public benefit. The plaintiffs' position is without merit as well. The principles of reliction and submergence are properly applied to this case.

**2. Choice of Law**

■ At the time of statehood, North Dakota acquired title to the bed of Devils Lake up to the ordinary high water mark under federal law. As a general matter, federal law recognizes the boundary between the upland ownership and the bed ownership to be the OHWM.

The OHWM is defined as the border of land "which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its value for agricultural purposes." *Rutten v. State,* 93 N.W.2d 796, 799 (N.D.1958), *quoting Tilden v. Smith,* 94 Fla. 502, 113 So. 708 (1927). "It is the land upon which the waters have visibly asserted their dominion, and does not extend to or include that upon which grasses, shrubs, and trees grow, though covered by great annual rises." *Harrison v. Fite,* 148 F. 781, 783 (8th Cir.1906). The OHWM has also been described as "the line which the water impresses on the soil by covering it for sufficient periods to deprive it of vegetation." U.S. Department of the Interior, Bureau of Land Management, *Manual of Instructions for the Survey of the Public Lands of the United States,* 93 (1973). In places where banks are low and flat, the OHWM "is the point up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation, constituting what may be termed ordinary agricultural crop." *Rutten,* 93 N.W.2d at 799.

While federal law extends an upland owner's rights only to the ordinary high water mark, North Dakota law provides that an upland owner "takes to the edge of the lake ... at low watermark." N.D. Cent.Code 47–01–15 (1978); *Hogue v. Bourgois,* 71 N.W.2d 47, 52 (N.D.1955). The low water mark has been variously described. In *Gardner v. Green,* 67 N.D. at 269–70, 271 N.W. at 776, the court equated it with the "shore line." *Slauson v. Goodrich Transportation Co.,* 94 Wis. 652, 645, 69 N.W. 990, 992 (1897), described it as "the line or level at which the waters of a lake usually stand when free from disturbing causes." It has also been defined as the ordinary low water mark, unaffected by drought, that is, the height of the water at ordinary states of low water." *In re York Haven Water & Power Co.,* 212 Pa. 622, 62 A. 97 (1905). South Dakota defines it as "the low level reached by the waters of a

lake under ordinary conditions unaffected by periods of extreme and continuous drought." *South Dakota Wildlife Federation v. Water Management Board,* 382 N.W.2d 26, 27 (S.D.1986).

It is not entirely clear from the language of the North Dakota statute whether it grants upland owners title or only a license or easement down to the OLWM, but it is apparent that North Dakota law would extend some interest or rights to upland owners not provided under federal law.[8] The rights granted by North Dakota law apply in this case only if state law governs this boundary dispute. Thus, the court must first determine whether federal law or state law should be applied in this case.

The Supreme Court's decision in *California ex rel. State Lands Commission v. United States,* 457 U.S. 273, 102 S.Ct. 2432, 73 L.Ed.2d 1 (1982), involved a choice of law question in determini-ownership of oceanfront lands formed by accretion to federal property. The Court determined that federal law determines the boundary of oceanfront lands owned or patented by the United States. *California,* 457 U.S. at 288, 102 S.Ct. at 2441. In an unrelated California case, *California ex rel. State Lands Commission v. United States,* 805 F.2d 857 (9th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987), the Ninth Circuit held that federal law applied to boundary determinations around Mono Lake in California. The federal government held 70% of Mono Lake's uplands, and private owners held the other 30%. *Id.,* 805 F.2d at 859–61. The Ninth Circuit stated that "federal law governs the present case since the United States owns the uplands to Mono Lake and claims title to the exposed lake bed." *Id.* at 861.

In its *California* decision, the Supreme Court discussed the decision in *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 377, 97 S.Ct. 582, 590, 50 L.Ed.2d 550 (1977). In *Corvallis Sand & Gravel* the Court stated as follows:

> We hold the true principle to be this, that whenever the question in any Court, state or federal, is, *whether* a title to land which had once been the property of the United States has passed, the question must be resolved by the laws of the United States; but that *whenever,* according to those laws, *the title shall have passed,* then that property, like all other property in the state, is *subject to state legislation;* so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States.

*Corvallis Sand & Gravel Co.,* 429 U.S. 363, 377, 97 S.Ct. 582, 590, 50 L.Ed.2d 550 (1977), *quoting Wilcox v. Jackson,* 38 U.S. (13 Pet.) 498, 517, 10 L.Ed. 264 (1839) (emphasis added by *Corvallis Sand & Gravel* Court). Two years after issuing *Corvallis,* the Supreme Court noted that its principle does not apply "where the [United States] Government has never parted with title and its interest in the property continues." *Wilson v. Omaha Tribe of Indians,* 442 U.S. 653, 670, 99 S.Ct. 2529, 2539, 61 L.Ed. 2d 153 (1979). In its *California* decision, the Court noted that *Corvallis Sand & Gravel* "does not extend to land remaining in federal hands." *California,* 457 U.S. at 282 n. 10, 102 S.Ct. at 2438 n. 10.

In the present case, the plaintiffs' title was derived from patents by the United States or federal grants of school lands to the State with subsequent issuance of pat-

---

**8.** The plaintiffs and the United States agree that the nature of the rights or interest conferred by section 47–01–15 need not be determined in this case. They state that upon resolution of all other issues, a general reference to and recognition of the private land owners' rights and interest under section 47–01–15 would sufficiently resolve their boundary dispute. The intervenors, on the other hand, argue that the extent of these rights should be addressed and the issue certified to the North Dakota Supreme Court.

The intervenors are not direct parties to the present boundary dispute. They are involved in the action by virtue of the conveyance to the United States. They retain no ownership interest in the disputed lands. Because the plaintiffs and the United States do not have a bona fide controversy on the issue of rights under section 47–01–15, that issue is not truly presented for adjudication, and certainly is not a proper issue for certification.

ents by the State. The disputed lake bed lands were acquired by the State under the equal footing doctrine. To this extent, the present case is controlled by *Corvallis Sand & Gravel.* Title to the land in question was passed under federal law. Consequently, the land is now subject to state law. *Corvallis Sand & Gravel,* 429 U.S. at 377, 97 S.Ct. at 590. This is not a case in which the United States is defending title to property it has always retained. Instead, it is defending its claim to property it reacquired from the State. For this reason, state law and not federal law should be applied to determine the boundary of and other rights in the disputed lands.

## LOCATION OF THE WATER MARKS

The plaintiffs are title owners of riparian lands. These lands are subject to the benefits and burdens of riparian ownership. The plaintiffs or their predecessors in interest have previously reaped the benefits of riparian ownership and assert title to land below the meander line and OHWM at the time of statehood by virtue of the doctrine of reliction. The plaintiffs are now subjected to the burden of riparian ownership by virtue of submergence.[9] By the process of submergence, the OHWM and the OLWM have moved.

1. Location of the Current Ordinary High Water Mark

The district court directed the special master to determine whether the present location of the OHWM can be established. At the evidentiary hearing, the parties introduced a variety of evidence on the issue. The most persuasive evidence with regard to the location of the OHWM is a series of photographs introduced by the defendant. Defendant's exhibit nos. 308 A–C & 308 F–L are photographs of locations near the water's edge of Devils Lake at approximately 1,427 feet above sea level. These photographs show that at that level, there

is a division between terrestrial vegetation and aquatic vegetation. The photographs support a conclusion that at approximately 1,427 feet, the lake has wrested the land of its vegetation and destroyed the land of its value for agricultural purposes. *See Rutten,* 93 N.W.2d at 799.

The intervenors argue that the OHWM is located at 1,440 feet above sea level. They argue this elevation based on both a study of the vegetation and of the geology of the area. In terms of vegetation, the intervenors presented evidence that above 1,440 feet there is vegetation that is much older than vegetation found below that level. The intervenors also presented evidence indicating that there is a band of major geomorphic stability at 1,440 feet. Because the 1,440 foot elevation is above the meander line, intervenors propose that the OHWM be determined to be located at the meander line.

In reviewing the intervenors' evidence, the special master agrees that the vegetation above 1,440 is much older than that below 1,440, and that there is a band of major geomorphic stability at that level. But these facts do not have the significance argued by the intervenors. The test for an OHWM relates to the place where the water has wrested the land of its vegetation and diminished the value of the land for agricultural purposes. The evidence presented in this case clearly indicates that the plaintiffs were using the bared lands of the West Bay for agricultural purposes for sixty years or more. To say that the lands between 1,440 feet and 1,427 feet are unsuitable for agricultural purposes is to defy history. Consequently, the intervenors' position is rejected.

2. Location of the Ordinary Low Water Mark

The clearest definitoin of the OLWM was codified by the South Dakota legislature. South Dakota defines it as "the low level

---

**9.** Submergence involves the gradual and imperceptible rise in water level so that land formerly free of water is covered with water. The plaintiffs make no argument that the current rise in water was not gradual and imperceptible. The intervenors did present testimony of a psycholo-

gist and did submit into evidence his report regarding the gradual and imperceptible rise of Devils Lake. This evidence provides no basis for concluding that the rise of Devils Lake from its low level to its present level was other than gradual and imperceptible.

reached by the waters of a lake under ordinary conditions unaffected by periods of extreme and continuous drought." *See South Dakota Wildlife Federation*, 382 N.W.2d at 27. Unlike the OHWM, which is located by reference to conditions around the lake, the OLWM must be located by reference to recorded water levels.

The special master's location of the OLWM is based on reference to North Dakota exhibit no. 408. Exhibit No. 408 lists the maximum and minimum recorded water levels of Devils Lake from 1901 to 1986, except for the years 1922 through 1928, which had only single yearly observations. Scattered observations every three or four years are also included from 1867 to 1896. In applying this data to establish the OLWM, the first task is to identify periods of time which are unaffected by periods of extreme and continuous drought.

Devils Lake experienced many years of severe drought in the first half of this century. In 1940, the lake dropped below 1401 feet, ending a fairly continuous decline from the record high elevation of 1438.4 feet, recorded in 1867. Identifying a period unaffected by extreme and continuous drought is not a scientific matter. Rather, the special master is guided in its determination by a review of the rainfall charts for Devils Lake and of the lake level charts. As a starting point, however, the special master takes note of the general experience of the 1930s as having been a historically dry period. This is confirmed by the rainfall table which indicates below average rainfall for six of the seven years from 1933 to 1939. N.D. exhibit no. 255 at 12. Not until the late 1960s was there a similar dry spell. *Id.*

Turning to the water elevations, the special master can identify in particular one minimum yearly water level that occurred both before and after periods of drought and periods of lake elevation decline. In 1921, the lake was at an elevation of 1416.-6. This was very near the recorded lows in 1918 (1,416.4) and 1920 (1,416.2). It was also near the single recorded elevations in 1922 (1,417.2), 1923 (1,416.3), and 1924 (1,416.2). Further, after the dry period in

the late 1960s, the minimum level for the lake jumped from 1,410.5 in 1969 to 1,416.6 in 1970. From 1970 to date, the lake has been well above the 1,416 level. In applying the law to the facts of this case, the special master finds that the ordinary low water mark is at the 1,416.6 level. This represents a low lake level when the lake is unaffected by periods of extreme and continuous drought.

## CONCLUSION

The special master concludes that the court has jurisdiction of this case. The location of the property owners' boundaries are determined, in this case, by reference to state law. It is further concluded that the doctrines of reliction and submergence apply to the West Bay of Devils Lake. The OHWM is ambulatory and has moved since statehood. The OHWM is now located at 1,427 feet. The OLWM is located at 1,416.6 feet. The special master concludes that the title to the subject patented lands and relicted lands above the OHWM are held by plaintiffs, and the lands below the OHWM are held by the United States, subject to the rights conferred upon plaintiffs, down to the OLWM, by N.D.Cent.Code § 47–01–15.

IT IS RECOMMENDED that the district court enter judgment in conformity with this report.

Pursuant to Rule 53(e) of the Federal Rules of Civil Procedure, any party may file and serve written objections to this report within 10 days after being served notice of its filing, and may move the district court for action upon this report and upon objections thereto.